1   **REESE RICHMAN LLP**
    Michael R. Reese (Cal. State Bar. No. 206773)
2   michael@reeserichman.com
    Kim E. Richman
3   kim@reeserichman.com
    Belinda L. Williams
4   belinda@reeserichman.com
5   875 Avenue of the Americas, 18th Floor
    New York, New York 10001
6   Telephone: (212) 643-0500
7   Facsimile: (212) 253-4272

8   **WHATLEY DRAKE & KALLAS, LLC**
    Deborah Clark-Weintraub
9   dweintraub@wdklaw.com
10  1540 Broadway, 37th Floor
    New York, New York  10036
11  Telephone:  (212) 447-7070
    Facsimile:  (212) 447-7077
12

13  *Counsel for Plaintiffs*
    [Additional counsel listed on signature page]
14

15          **UNITED STATES DISTRICT COURT**
         **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
16                 **SOUTHERN DIVISION**

17  JOANNE GAINES and JOHNNIE      )
    CAVE, on behalf of themselves and  ) Case No.  08-cv-667 AHS (RNBx)
18  all others similarly situated,     )
                                       )
19                      Plaintiffs,    ) **SECOND AMENDED COMPLAINT**
                                       ) **(CLASS ACTION)**
20        vs.                          )
                                       ) RICO 18 U.S.C. §1962 (c) and (d),
21  HOME LOAN CENTER INC. dba         ) Cal. Bus. & Prof. Code §17200 *et seq.*
    LENDING TREE LOANS;               ) and §17500 *et seq.*, Cal. Civ. Code §1750
22  LENDING TREE, LLC;                ) *et seq.*, Breach of Contract, Breach of
    and DOES 1 through 10,            ) Implied Covenant of Good Faith and Fair
23                                    ) Dealing and Unjust Enrichment.
24                      Defendants.   )
                                       ) **DEMAND FOR JURY TRIAL**
25                                    )

26            **PORTIONS REDACTED**
27
28  **(pages 6:25-7:7; 11:2-13; 16:24-17:9; and, Exhibit D redacted)**

Plaintiffs Joanne Gaines ("Gaines") and Johnnie Cave ("Cave") (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, by their undersigned attorneys, allege as follows:

## NATURE OF THE CASE

1.    As set forth more fully herein, during the Class Period, Defendants Lending Tree, LLC ("Lending Tree") and Home Loan Center Inc. dba Lending Tree Loans ("Lending Tree Loans") engaged in a deceptive scheme in violation of federal and state law whereby they pocketed tens of millions of dollars of bogus closing costs they charged to borrowers who had obtained mortgage loans from Lending Tree Loans. Specifically, prior to and in connection with the closing of mortgage loans issued by Lending Tree Loans during the Class Period, Lending Tree Loans presented Plaintiffs and other borrowers (the "TrueCost Class") with an amount for specified non-recurring closing costs for settlement services and goods to be provided by a settlement service company – *e.g.* appraisal, credit report, notary, and title insurance. Lending Tree Loans characterized this amount as the "TrueCost$^{SM}$" of closing the loans. In agreeing to pay $400 to lock in the TrueCost amount, Plaintiffs relied upon Lending Tree Loan's representations that the amounts quoted were for the specified closing costs. In fact, however, unbeknownst to borrowers, a significant portion of the "TrueCost$^{SM}$" amounts quoted and charged to Plaintiffs was skimmed off and pocketed by Lending Tree Loans and did not go towards any specified non-recurring closing costs in connection with the loans. In other words, far from the "true" amount of the specified closing costs, a portion of the "TrueCost$^{SM}$" closing charges paid by Plaintiffs and TrueCost Class Members was secretly pocketed by Lending Tree Loans, who performed none of the specified settlement services.

2.    Further, Lending Tree Loans deceived Plaintiffs and certain other borrowers (the "HELOC Class") by orally representing to the members of the HELOC Class that they were required to take out a Home Equity Line of Credit (HELOC) along with their option ARM loans in order to obtain a low interest rate on their option

1   ARM loans. Plaintiffs relied upon Lending Tree Loans' representations in agreeing to
2   take out the HELOC, and believed its empty promises that the HELOC could be
3   drawn upon after closing by using checks and credit cards that would be provided by
4   Lending Tree Loans after the closing.  In fact, however, the HELOCs were not a
5   condition to receiving a low interest rate, since a low interest rate (at least at the
6   inception of the loan) is a feature of an option ARM loan without regard to whether or
7   not a borrower takes out a HELOC at the time of the closing.  Nor were HELOC funds
8   available to members of the HELOC Class after closing because Lending Tree Loans
9   did not provide an option ARM loan large enough to pay off Plaintiffs' existing loans
10  and the closing costs in connection with the refinancings.  Accordingly, in order for
11  the closing to take place, the entire amount of the HELOC was required to be drawn
12  down at the closing leaving Plaintiffs and other members of the HELOC Class with a
13  second mortgage (instead of a HELOC), which also carried an adjustable interest rate
14  and had to be fully repaid in a much shorter time period than a conventional mortgage.
15  Lending Tree Loans nonetheless perpetuated the illusion that the HELOCs provided
16  available funds to the Plaintiffs by sending the Plaintiffs checks and promising them
17  credit cards that Plaintiffs could use to access their purported lines of credit, even
18  though, in reality, the lines of credit had been fully depleted at the closing and no
19  funds were available.

20      3.      Defendants' conduct has resulted in actual injury to Plaintiffs and
21  members of the Classes as follows:  first, members of the TrueCost Class have each
22  paid hundreds of dollars in bogus closing "costs" which were, in fact, secretly
23  pocketed by Lending Tree Loans who did not perform any specified settlement
24  services; and second, members of the HELOC Class find themselves saddled with a
25  second "mortgage" carrying a higher adjustable interest rate than the loan they
26  believed was sufficient to refinance their existing mortgages and that is due to be
27  repaid in a much shorter time frame.

28

4.      Defendants' conduct violates both federal and state laws that are intended to prevent the type of misconduct at issue here.  Plaintiffs have brought this action to put an end to Defendants' scheme and to recover the amounts improperly obtained from Plaintiffs and members of the Classes.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. §§ 1961, 1962 and 1964; 28 U.S.C. §§ 1331, 1332 and 1367; and, 15 U.S.C. § 15.  This Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. § 1965(b) and (d).  Diversity jurisdiction is also conferred over this class action pursuant to the Class Action Fairness Act of 2005, Pub. L. 109-2, § 7, 119 Stat. 13 ("CAFA").  It is appropriate to apply the California UCL, FAL and CLRA to protect a nationwide class because the wrongdoing alleged herein occurred in significant part in California, and Defendant Lending Tree Loans has its principal place of business within the state.  The Court has personal jurisdiction over the Defendants because Lending Tree Loans has its principal place of business within California, and the conspiracy and misconduct alleged occurred in significant part in California.

6.      Venue is proper in this district pursuant to 18 U.S.C. § 1965(a), 28 U.S.C. § 1391(b), 15 U.S.C. § 22, and 28 U.S.C. § 1391 because some of the Defendants are located within this district, do business or transact business within this district, and conduct the interstate trade and commerce described below in substantial part within this district.

7.      During all or part of the period in which the events described in this Complaint occurred, each of the Defendants participated in a scheme to defraud Plaintiffs and other members of the Classes in a continuous and uninterrupted flow of interstate commerce.

8.      The activities of Defendants, as described herein, were within the flow of, and had a substantial effect on, interstate commerce.

# PARTIES

## PLAINTIFFS

### Plaintiff Joanne Gaines

9.      Plaintiff Joanne Gaines is a homeowner who resides in the Bronx, New York. Ms. Gaines is a citizen of New York because Ms. Gaines is domiciled in Bronx County, New York and has no intention of changing her domicile.

10.     In the Fall of 2006, Ms. Gaines discussed refinancing her mortgage with representatives of Lending Tree Loans. After speaking over the telephone from her home in the Bronx, New York on several occasions with Theresa Blaskovich ("Blaskovich"), a Lending Tree Loans representative located in Irvine, California, Ms. Gaines was persuaded to refinance her existing home mortgage with an option ARM loan from Lending Tree Loans. Ms. Gaines was not represented by an attorney in connection with the refinancing transaction, and the loan was closed via fax. Ms. Gaines, who did not previously own a fax machine, purchased one for purposes of closing the transaction with Lending Tree Loans.

11.     Between October 31, 2006, the date of her first conversation with Ms. Blaskovich, and December 19, 2006, the date of the closing, numerous misrepresentations were made to Ms. Gaines by Lending Tree Loans in writing and over the telephone regarding the terms and conditions of her refinancing transaction. Pursuant to an interstate telephone conversation that occurred between Ms. Blaskovich and Ms. Gaines on or about October 31, 2006, Ms. Blaskovich had a number of documents ("Gaines Mortgage Documents") sent via the U.S. mail to Ms. Gaines.

### TrueCosts Scheme

12.     With respect to TrueCost closing charges, a Home Loan Center 30 Day Lock-in Disclosure Form sent via U.S. mail to Ms. Gaines on or about October 31, 2006 and signed by Ms. Blaskovich (with permission by a fellow Lending Tree employee) and countersigned by Ms. Gaines on November 4, 2006

- 4 -

stated that the TrueCost charges of $3,500 were for "specified closing costs." *See* Exhibit A attached hereto (HLC 000434). These specified closing costs – appraisal services, title reports, escrow charges, title insurance and flood certifications – were identified on the 30-Day Lock-In Disclosure & Agreement (Exhibit A) and another form provided to Ms. Gaines titled "Affiliated Business Disclosure Statement," which disclosed that LTSS, an affiliate of Lending Tree Loans, was the vendor that would provide the settlement services in the event the 30-Day Lock-In Disclosure & Agreement was executed (Exhibit B). Pursuant to the terms of the 30-Day Lock-In Disclosure & Agreement, Ms. Gaines paid $400 to lock in the TrueCost amount for the specified closing costs as represented to her by Lending Tree Loans. Significantly, the Good Faith Estimate of Settlement Charges received by Ms. Gaines (Exhibit C) did not disclose that a large portion of the TrueCost amount would be pocketed by Lending Tree Loans, unrelated to any specified settlement services.

13.     Ms. Gaines relied upon the representations in the documents she received that the $3,500 in TrueCost charges were for the specified closing costs. In truth, however, the entirety of the $3,500 "TrueCost" amount was not used for the "specified closing costs;" rather $1,544.40 of this amount was pocketed by Lending Tree Loans unrelated to settlement services. The 30 Day Lock-in Disclosure Form received by Ms. Gaines in advance of the closing did not disclose that the $3,500 TrueCost charge included a hidden amount of $1,544.40 would be pocketed by Lending Tree Loans unrelated to the costs of settlement services.     Indeed, Lending Tree Loans retained an astounding 44% of the TrueCost charge paid by Ms. Gaines.

14.     Ms. Gaines would not have paid the True Cost amount, or the $400 Lock-in fee, had she known that 44% of the amount quoted in the documents was not to be used to pay the specified closing costs but instead was a hidden fee that would be pocketed by Lending Tree Loans for itself as pure profit.

**HELOC Scheme**

15.      Lending Tree Loans also made numerous misrepresentations to Ms. Gaines regarding the HELOC. In her conversations with Ms. Gaines in October and November 2006, Lending Tree Loans representative Theresa Blaskovich told Ms. Gaines that she was eligible for a HELOC, that taking out the HELOC was a prerequisite to obtaining a low interest rate option ARM loan to refinance her existing mortgage, and that the HELOC would provide Ms. Gaines with a line of credit that she could draw upon after the closing of her mortgage. Blaskovich also told Ms. Gaines during these October/November 2006 telephone conversations that Ms. Gaines would receive a book of checks after the closing that Ms. Gaines could use to access the money that would be available to her in the HELOC. In approximately January 2007, Lending Tree Loans representative Faith Dang ("Dang"), who was located in Irvine, California, placed a telephone call to Ms. Gaines in the Bronx, New York and told Ms. Gaines that Ms. Gaines would have funds available to her pursuant to the HELOC and that Lending Tree Loans would send Ms. Gaines a check book containing blank checks that she could use to withdraw funds from her HELOC. Ms. Gaines received said HELOC checkbook by U.S. mail soon thereafter in approximately January/February 2007 only to find out that the checks were worthless because the HELOC had been completely depleted at the closing to satisfy her existing mortgage and closing costs, including the bogus TrueCost charges leaving, nothing available to Ms. Gaines as previously represented.

16.      Call scripts utilized by Lending Tree Loan representatives emphasized that ███████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████

- 6 -

1 ████████████████████████████████████████████

2 ████████████████████████████████████████████

3 ████████████████████████████████████████████

4 ████████████████████████████████████████████

5 ████████████████████████████████████████████

6 ████████████████████████████████████████████

7 ████████████████████████████████

8       17.     In addition to the foregoing oral misrepresentations, the Gaines

9 Mortgage Documents mailed to Ms. Gaines on or about October 31, 2006 by Ms.

10 Blaskovich also misrepresented that the HELOC was a line of credit, instead of a

11 traditional second mortgage, that could be drawn upon after the closing. Specifically,

12 the HELOC agreements which Lending Tree Loans prepared for Ms. Gaines to sign

13 prominently stated "HOME EQUITY LINE OF CREDIT" *See* Exhibit E - Gaines

14 attached hereto (HLC 000778-782). The documents provided to Ms. Gaines also

15 misled her to believe that the line of credit would be available for her use in that it

16 stated "More and more lenders are offering home equity lines of credit. By using the

17 **equity** in your home, you may qualify for a sizable amount of credit, *available for use*

18 *when and how you please*, at an **interest rate** that is relatively low…..many

19 homeowners use their credit lines only for major items such as education, home

20 improvements, or medical bills and not for day-to-day expenses…*Once approved for*

21 *a home equity line of credit, you will be able to borrow up to your credit limit*

22 *whenever you want.*" (HLC 000778) (italics emphasis added; underline emphasis in

23 original). The document also distinguished between a line of credit and traditional

24 second mortgage leading Ms. Gaines to believe she was receiving a home equity line

25 of credit (instead of a second mortgage) that would be available to her after the

26 closing. Specifically, the document stated "If you are thinking about a home equity

27 line of credit, you might also want to consider a traditional second mortgage loan. A

28 second mortgage provides you with a fixed amount of money repayable over a fixed

1    period…You might consider a second mortgage instead of a home equity line if, for

2    example, you need a set amount for a specific purpose, such as an addition to your

3    home." (HLC 000780) This document, along with the oral misrepresentations

4    detailed above, was materially false and misleading, however, as Ms. Gaines never

5    had a line of credit available to her as it was completely depleted at closing.

6    18.    As stated above, Ms. Gaines relied upon the foregoing

7    representations regarding the TrueCost charges would only be for specified

8    closing costs, and that the HELOC would provide an available line of credit, and

9    as a result refinanced her existing mortgage loan and obtained an option ARM

10    mortgage and HELOC from Defendant Lending Tree Loans secured by her

11    residence. In connection with her refinancing, Ms. Gaines paid more than $1500

12    in bogus closing costs pocketed by Defendant Lending Tree Loans, which

13    provided none of the specified settlement services, and was required to start

14    immediate payment on the HELOC at high interest rates due to the fact the entire

15    line of credit was drawn down at closing and treated as a second mortgage, and

16    not a home equity line of credit.

17    19.    Prior to refinancing her mortgage with Lending Tree, Ms. Gaines

18    owned her home for approximately ten years and had never missed a payment on

19    her mortgage. Because of Defendants' misconduct, Ms. Gaines is now in serious

20    financial difficulty and is in jeopardy of losing her home.

21    **Plaintiff Johnnie Cave**

22    20.    Plaintiff Cave is a former homeowner whose home was located in

23    Chesterfield, Virginia. Ms. Cave lost her home due to Defendants' misconduct

24    detailed herein. Plaintiff Cave is a citizen of Virginia because Ms. Cave is

25    domiciled in Chesterfield County, Virginia and has no intention of changing her

26    domicile.

27    21.    In the Fall of 2006, Plaintiff Cave discussed refinancing her

28    mortgage with Lending Tree Loans. After speaking over the telephone from her

1    home in Chesterfield, Virginia on several occasions with Lending Tree Loans
2    representative Theresa Blaskovich, who was located in Irvine, California, Ms.
3    Cave was persuaded to refinance her existing home mortgage with an option
4    ARM loan from Lending Tree Loans.   Ms. Cave was not represented by an
5    attorney in connection with the refinancing transaction.

6        22.    Between September 26, 2006, the date of her first conversation
7    with Blaskovich, and October 12, 2006, the date of the closing, numerous
8    misrepresentations were made to Ms. Cave by Lending Tree Loans in writing and
9    over the telephone regarding the terms and conditions of her refinancing
10   transaction.   Pursuant to an interstate telephone conversation that occurred
11   between Blaskovich and Ms. Cave on or about September 26, 2006, Blaskovich
12   had a number of documents ("Cave Mortgage Documents") sent via U.S. mail to
13   Ms. Cave.

14   **TrueCost Scheme**

15       23.    With respect to TrueCost closing charges, a Home Loan Center 30
16   Day Lock-in Disclosure Form was sent to Ms. Cave via U.S. mail on or about
17   September 26, 2006 at the direction of Ms. Blaskovich that stated that the
18   TrueCost charges of $2,500 were for "specified closing costs."   *See* Exhibit A -
19   Cave attached hereto.   These specified closing costs – appraisal services, title
20   reports, escrow charges, title insurance and flood certifications – were identified
21   on the 30 Day Lock-In Disclosure and Agreement (Exhibit A) and on another
22   form provided to Ms. Cave titled "Affiliated Business Disclosure Statement,"
23   which disclosed that LTSS, an affiliate of Lending Tree Loans, was the vendor
24   that would provide the settlement services in the event the 30-Day Lock-In
25   Disclosure & Agreement was executed (Exhibit B).   Pursuant to the terms of the
26   30-Day Lock-In Disclosure & Agreement, Ms. Cave paid $400 to lock in the
27   TrueCost amount for the specified closing costs as represented to her by Lending
28   Tree Loans.

24.    Ms. Cave relied upon the representations in the documents she received that the $2,500 in TrueCost charges were for the specified closing costs. In truth, however, the entirety of the $2,500 "TrueCost" amount was not used for the "specified closing costs;" rather $934.00 of this amount was covertly pocketed by Lending Tree Loans.  The 30 Day Lock-in Disclosure Form received by Ms. Cave in advance of the closing did not disclose that of the $2,500 TrueCost charge an amount of $934.00 would be pocketed by Lending Tree Loans unrelated the costs of settlement services.  Indeed, Lending Tree Loans retained an astounding 37% of the TrueCost charge paid by Ms. Cave.

25.    Ms. Cave would not have paid the TrueCost amount, or the $400 Lock-In fee, had she known that 37% of the amount quoted was not to be used to pay the specified closing costs but instead was would be pocketed by Lending Tree Loans unrelated the costs of settlement services.

**HELOC Scheme**

26.    Lending Tree Loans also made numerous representations to Ms. Cave regarding the HELOC.  In her conversations with Ms. Cave in September and October 2006, Lending Tree Loans mortgage banker Theresa Blaskovich told Ms. Cave that Ms. Cave was eligible for a HELOC that would provide Ms. Cave with a line of credit that she could draw upon after the closing of her mortgage. Ms. Blaskovich also told Ms. Cave during these September/October 2006 telephone conversations that Ms. Cave would receive a book of checks after the closing that Ms. Cave could use to access the money that would be available to her in the HELOC after the closing.  Ms. Cave received said HELOC checkbook via U.S. mail soon thereafter in approximately November 2006 only to find out that the checks were worthless because the HELOC had been completely depleted at the closing to satisfy her existing mortgage and closing costs, including the bogus TrueCost charges, leaving nothing available to Ms. Cave as previously represented.

27.    Call scripts utilized by Lending Tree Loan representatives emphasized that 

28.    In addition to the foregoing oral misrepresentations, the Cave Mortgage Documents mailed to Ms. Cave on or about September 26, 2006 by Ms. Blaskovich also misrepresented that the HELOC was a line of credit that could be drawn upon after the closing.  Specifically, the HELOC agreements which Lending Tree Loans prepared for Ms. Cave to sign prominently stated "HOME EQUITY LINE OF CREDIT".  *See* Exhibit E (Cave Documents) attached hereto (HLC 000199-203). The documents provided to Ms. Cave also misled her to believe that the line of credit would be available for her use in that it stated "More and more lenders are offering home equity lines of credit.  By using the **equity in your home**, you may qualify for a sizable amount of credit, ***available for use when and how you please***, at an **interest rate** that is relatively low…..many homeowners use their credit lines only for major items such as education, home improvements, or medical bills and not for day-to-day expenses…***Once approved for a home equity line of credit, you will be able to borrow up to your credit limit whenever you want.***"  (HLC 000199) (italics emphasis added; underline emphasis in original).  The document also distinguished between a

line of credit and traditional second mortgage leading Ms. Cave to believe she was received a home equity line of credit (instead of a second mortgage) that would be available to her after the closing. Specifically, the document stated "If you are thinking about a home equity line of credit, you might also want to consider a traditional second mortgage loan. A second mortgage provides you with a fixed amount of money repayable over a fixed period. You might consider a second mortgage instead of a home equity line if, for example, you need a set amount for a specific purpose, such as an addition to your home." (HLC 000201). This document, along with the oral misrepresentations detailed above, was materially false and misleading, however, as Ms. Cave never had a line of credit available to her as the HELOC was completely depleted at closing.

29.    As stated above, Ms. Cave relied upon the foregoing representations made by Defendants regarding the TrueCost charges, and that the HELOC would provide an available line of credit, and as a result of these representations refinanced her existing mortgage loan and obtained an option ARM loan and HELOC from Defendant Lending Tree Loans secured by her residence. In connection with her refinancing, Ms. Cave paid more than $900 in bogus closing costs pocketed by Lending Tree Loans, and Ms. Cave was required to start immediate payment on the HELOC at high interest rates due to the fact that the entire line of credit was drawn down at closing and treated as a second mortgage, and not a line of credit.

30.    Prior to refinancing her mortgage with Lending Tree, Ms. Cave owned her home for approximately seven years and had never missed a payment on her mortgage. Due to Defendants' misconduct as alleged herein, however, Ms. Cave has lost her home and now resides in a senior-living facility in Chesterfield, Virginia.

**DEFENDANTS**

31.    Defendant Lending Tree LLC is a Delaware limited liability company which maintains its corporate headquarters in Charlotte, North Carolina. Lending Tree is a computerized loan originator for mortgage loans performing computerized loan origination services for lenders. Lending Tree does not make mortgage loans or commitments. From August 8, 2003 until August 20, 2008, Defendant Lending Tree was an operating company of IAC/Interactive ("IAC"). On August 20,2008, IAC spun-off Lending Tree into a separate entity, Tree.com.

32.    Defendant Lending Tree Loans, a wholly owned subsidiary of Defendant Lending Tree, is headquartered at 163 Technology Drive, Irvine, California. Lending Tree Loans is a licensed mortgage lender/broker authorized to do business in all fifty states. Lending Tree acquired all of the outstanding stock of Defendant Lending Tree Loans on December 14, 2004.

33.    Non-party Lending Tree Settlement Services LLC ("LTSS"), a wholly-owned subsidiary of Lending Tree, is a Delaware limited liability company which maintains its headquarters in Jacksonville, Florida. LTSS provides title, closing, appraisal and flood services to Lending Tree Loans. Launched in July 2004 as a joint venture with Wachovia Corporation's Greenlink LLC, LTSS became a wholly owned subsidiary of Lending Tree LLC in 2005.

34.    Defendants DOES 1 through 10, inclusive, are sued herein under fictitious names because their true names and capacities whether individual, associate, corporate, governmental or otherwise are unknown to Plaintiffs. Plaintiffs will ask leave of this Court to amend this Complaint to assert the true names and capacities of said Defendants when same are ascertained. Plaintiffs are informed and believe and thereon allege that each of the Defendants designated herein as DOE, or named, is negligently, carelessly, recklessly, strictly or otherwise responsible in some manner for the events and happenings herein referred to and caused damages directly and proximately thereby to Plaintiffs.

1    35.    The Defendants are sued as principals or agents, servants, and

2  employees of said principals and/or agents of each other and all of the acts performed

3  as agents and employees were performed within the course and scope of their

4  authority and employment and/or agency and with the consent of each of the

5  Defendants.

6                              **FACTUAL ALLEGATIONS**

7  **BACKGROUND**

8    36.    LendingTree, Inc. was founded in 1996 by its current chairman and

9  CEO Doug Lebda and others.  The LendingTree, Inc. website was launched in 1998

10  and advertised its services as creating a competitive marketplace where lenders would

11  compete for consumers' loan business using the slogan, "When banks compete, you

12  win."  LendingTree Inc.'s service was advertised as free to consumers but not to

13  lenders, who paid a referral fee to be in the LendingTree, Inc.'s network.  Specifically,

14  Lending Tree stated on its website the following:

15    **What is LendingTree?**

16        Our free service connects borrowers like you with lenders

17        who provide a variety of products including mortgages, auto loans

18        and home equity loans.

19  LendingTree, Inc. went public in 2000, and was acquired by IAC in 2003 in a deal

20  valued at more than $700 million, a substantial premium to Lending Tree

21  shareholders.  Following its acquisition by IAC, on December 29, 2004, LendingTree,

22  Inc. converted to Lending Tree LLC, a Delaware limited liability company.

23    37.    In an effort to generate additional revenues following its acquisition by

24  IAC, a public company, in December 2004, Lending Tree LLC acquired

25  HomeLoanCenter.com, an Internet-based direct mortgage lender headquartered in

26  Irvine, California, and formed Defendant Lending Tree Loans, a licensed mortgage

27  broker and lender.  Notwithstanding the fact that Lending Tree advertised itself as a

28  competitive marketplace in which lenders competed for consumers' business,

1 following Lending Tree's acquisition of Lending Tree Loans, a portion of the
2 inquiries received through the Lending Tree website were provided exclusively to
3 Lending Tree Loans.   In other words, as to these inquiries, unbeknownst to
4 consumers, Lending Tree Loans did not "compete" with other lenders.

5       38.      According to IAC's Form 10-K for the year ended December 31, 2005,
6 filed with the Securities and Exchange Commission ("SEC"), Lending Tree's ability
7 to close loans sourced through its website in its own name resulted in a substantial
8 increase in revenues per closing as Lending Tree's revenues grew 131% to $367.8
9 million for the fiscal year ended December 31, 2005.   Like its corporate parent
10 Lending Tree, in its advertising, including direct mail solicitations to borrowers,
11 Lending Tree Loans represented that there were "no hidden fees" in connection with
12 its services. *See* Exhibit F (HLC003634-35, HLC003636-37).

13       39.      In a further effort to boost revenues and capture a greater share of fee
14 revenue from mortgage lending generated by the Lending Tree LLC website, in July
15 2004, Lending Tree LLC launched LTSS as a joint venture with Wachovia
16 Corporation's Greenlink LLC.   In 2005, Lending Tree LLC bought Wachovia's
17 interest in LTSS.  According to IAC's Form 10-K for the year ended December 31,
18 2006, filed with the SEC, revenues from settlement services contributed to the 17%
19 growth in Lending Tree's revenues in 2006.

20       **Lending Tree's Scheme to Charge Consumers Bogus Closing Costs**

21       40.      During the relevant period, Lending Tree touted LTSS' provision of
22 "bundled" settlement services as beneficial to consumers by representing that the
23 "bundles" carried lower total costs than would result if the same services were
24 assembled individually and provided certainty with respect to closing costs. An April
25 18, 2005 press release issued by LTSS stated that "using LTSS allows [consumers] to
26 benefit from competitive pricing, speedier service, upfront disclosure, and a quicker
27 processing time."   In addition, a January 28, 2006, article by Kenneth R. Harney
28 available at www.washingtonpost.com titled "A Good-Faith Effort To Clean Up

1   Estimates", quoted David Anderson, a Senior Vice President of Business

2   Development at Lending Tree and Senior Vice President and General Manager of

3   LTSS, as stating that Lending Tree "got into the business of offering bundled services

4   as both a quality-control measure *and a way to reduce costs for lenders and their*

5   *borrowers*." In its communications with consumers, Lending Tree Loans referred to

6   the charge for this "bundle" of settlement services as the "TrueCost$^{SM}$".

7          41.     Lending Tree Loans provided borrowers with two documents that

8   described the closing costs purportedly covered by the TrueCost charge. The first, a

9   document titled "30 Day Lock-in Disclosure Form," stated that the TrueCost

10  charges quoted were for "specified closing costs," and identified these specified

11  closing costs as appraisal services, title reports, escrow charges, title insurance

12  and flood certifications.  *See* Exhibit A.  The second document was titled

13  "Affiliated Business Disclosure Statement," and disclosed that LTSS, an affiliated

14  company, was the vendor that would provide these settlement services in the event

15  the 30-Day Lock-In Disclosure & Agreement was executed.  *See* Exhibit B.

16  Lending Tree Loans presented borrowers with a lump sum TrueCost$^{SM}$ amount.  In its

17  communications with borrowers, Lending Tree did not provide a break down of how

18  the TrueCost amount quoted would be allocated among the settlement services

19  identified in these documents.

20  ██████  In addition, call scripts provided by Lending Tree Loans to its

21  representatives provided Lending Tree Loan representatives with talking points to be

22  used in selling TrueCost charges to borrowers.  Specifically, the call scripts, which

23  were required to be read to borrowers verbatim, falsely stated that closing costs were

24  ████████████████████████████████████████████████

25  ████████████████████████████████████████████████

26  ████████████████████████████████████████████████

27  ████████████████████████████████████████████████

28  ████████████████████████████████████████████████



43.     In fact, however, despite what the call scripts, the documents sent to Plaintiffs by Lending Tree Loans, and the "TrueCost^SM" name itself represented, the amount quoted did not represent the "true cost" of the specified settlement services required to close the loan and a substantial percentage of the TrueCost charges were perfectly avoidable by declining to utilize LTSS.  On average, Lending Tree Loans pocketed more than 40% of the TrueCost charges although it provided none of the specified settlement services.  From December 2004 through October 14, 2009, Lending Tree Loans collected $203,053,620.10 in TrueCost charges and retained $93,764,049.88 for itself unrelated to the costs of settlement services – an astounding 46%.  In addition, Lending Tree Loans billed Plaintiffs and Class members an additional "Lock-In Fee" to supposedly save money with "TrueCost^SM".

44.     Thus, the provision of bundled settlement services through LTSS was financially advantageous for Defendants, not consumers.   To the contrary, the "True Cost^SM" figure quoted to borrowers included not only the cost of the specified settlement services but also a substantial, undisclosed amount to be paid to Lending Tree Loans, which provided none of the specified settlement services.  The amount skimmed off and pocketed by Lending Tree Loans was the difference between the "TrueCost^SM" amount quoted to borrowers and the amounts actually paid for settlement services in connection with the loan.

45.    Each of the Plaintiffs was victimized by this fraudulent scheme. For example, Lending Tree Loans quoted and charged Ms. Gaines a "TrueCost$^{SM}$" amount of $3,500 in connection with her refinancing, which closed in December 2006. In fact, however, the "true" costs of the specified settlement services in connection with Ms. Gaines' loan were substantially less – $1,955.60. Accordingly, the additional $1,544.40 pocketed by Lending Tree Loans was illegally disguised as a "cost" for specified settlement services, when, in fact, it did no go to pay for any specified settlement services.

46.    Similarly, Lending Tree Loans quoted and charged Ms. Cave a "TrueCost$^{SM}$" amount of $2,500 in connection with her refinancing, which closed in October 2006. In fact, however, the "true" costs of the specified settlement services in connection with Ms. Cave's loan were substantially less – $1,545.60. The additional $955 was fee pocketed by Lending Tree Loans, again, illegally disguised as a "cost" for specified settlement services purportedly provided.

47.    Compounding their injury, each of the Plaintiffs paid a "Lock-In Fee" to secure alleged closing costs savings as represented to be the "TrueCost$^{SM}$" amount. Ms. Gaines paid a $400 "Lock-In Fee" on or about November 4, 2006. Ms. Cave paid a $400 "Lock-In Fee" on or about September 26, 2006.

48.    Plaintiffs were not the only borrowers victimized by Lending Tree's TrueCost scheme during the relevant period. Indeed, these fraudulent fees charged by Lending Tree are so pervasive that a number of consumers have complained about them on consumer advocacy websites. The following are just a few examples (all emphasis added):

Steve of Mesa AZ (05/19/05)

*Lending Tree is using an unusual disclosure technique to hide actual closing costs from borrowers and build in "junk" fees*. I have had good experiences with them in the past when they were operating as a referral source, but *now*

- 18 -

1   *they are licensed as a bank and closing the loans in own*
2   *name, acting as the lender and playing by their own rules*
3   *with the federally required disclosures.  They also tried to*
4   *force me to use their settlement services company so they*
5   *can pocket those revenues as well.*  Unfortunately, even
6   though I am a banking professional myself, I did not realize
7   what they were up to until after they had already collected
8   $600 from me, which they refused to refund.
9
10  Basically  they  quoted  me  a  standard  rate  and
11  origination/discount cost which a [sic] agreed to.  *They also*
12  *mentioned  there  could  be  up  to  $2900  in  additional*
13  *closing costs.  They quoted this as the "True Cost" of the*
14  *transaction.  I was unconcerned because I had already*
15  *selected a title company that I routinely worked with and*
16  *knew that my actual costs would be about $1300, plus*
17  *some nominal charges for doc prep, etc.  When I received*
18  *their initial Good Faith estimate I was concerned that*
19  *they did not break out the settlement costs*, and they also
20  asked me to sign a disclosure indicating that I had not paid
21  for the appraisal and therefore had no right to a copy of it.
22  What was my $600 for?  The secondary investor's lock fee
23  I was told.
24
25  As I am an employee of the secondary investor, I knew this
26  was a lie and that this was really a tactic to keep me from
27  taking  the  appraisal  I  paid  for  and  going  to  another
28  mortgage source.  They want to inflict as much financial

pain as possible if you figure out you are being ripped off and try to leave. Sadly we lost $600 to Lending Tree, but even with that I am saving over $1000 by going somewhere else. *I spoke to several managers at Lending Tree and this was not a one off, but standard operating procedure. I suspect thousands of people are being treated this way and there are probably grounds for a class action suit.*

*        *        *

Paul of Lincoln CA (03/29/07)

We called for information after receiving an advertisement in the mail regarding mortgage reduction. Spoke to Scott and were told in order to start process, we had to pay $400.00 up front. We were quoted 5.875% + 2 points *and an additional $3505.00 in other costs and fees for a total of $9600.00 in settlement charges. We decided to check with our bank and found that* we were being overcharged points, the upfront fee was not reasonable and *the settlement charges were considered high*. We decided to go with our bank and when we called Scott he said he would match our bank's quote with a couple of exceptions.

We advised him that his company was no longer an option. We called and asked that the appraisal be cancelled and we submitted an e-mail to the company also. Unfortunately, the appraiser showed up at our door and we were told by Scott that they were keeping our $400 so we let the

- 20 -

1    appraiser do his job.  On the back of the form we responded

2    to, it stated that there are no fees to get started and no

3    obligation... and yet they took and kept our $400.00.  In the

4    meantime, we have sent letters (2/21 and 3/7) requesting at

5    least a copy of the appraisal, but to date nothing.

6    (http://www.consumeraffairs.com/finance/lending_tree.html (last visited 6-10-08))

7    49.    Similar complaints appear on http://www.amazon.com:

8    Deceptive practices, August 11, 2006

9    By Davis L. Cloward - *The "TrueCost" of a loan with*

10   *Lending Tree does not include origination fees for the*

11   *loan.  It is Lending Tree's fee.  It is one of the ways they*

12   *pay for their adds [sic] and make their money.  This is the*

13   *fee they charge for their services, which include reducing*

14   *your local costs (some filing fees/appraisal fees/etc).*

15   *What is deceptive about this is that your local costs will*

16   *sum up to less than half what they charge you with the*

17   *"TrueCost".  Also, remember, this "TrueCost" does not*

18   *include the origination fees for the loan.  So it does not*

19   *represent the true cost of the loan at all.  You will likely*

20   *find that any local mortgage broker can beat their offers.*

21   Better yet, try a local Credit Union. (I am NOT a broker nor

22   am I in this business, I merely got fooled and lost the

23   application fee. I had to sign deceptive forms that cost me

24   the application fee BEFORE a full disclosure of the real

25   cost of the loan.  Even with the loss of the $600.00 fee it

26   will still be less expensive for me to get my loan elsewhere!

27   I consider this a very expensive education and hope to save

28   others the experience.).

- 21 -

50.    As a result of the foregoing scheme, Defendants have deceived Plaintiffs and members of the TrueCost Class of no less than ninety-three million dollars.

**Lending Tree's HELOC Scheme**

51.    Plaintiffs were also deceived by oral misrepresentations that the HELOC was a prerequisite to obtaining a low-interest option ARM loan and by written misrepresentations that the HELOC was, in fact, a line of credit that could be drawn upon after the closing. Although the HELOC agreements prepared by Lending Tree Loans for Plaintiffs to sign prominently stated "HOME EQUITY LINE OF CREDIT" and represented that "More and more lenders are offering home equity lines of credit. By using the **equity** in your home, you may qualify for a sizable amount of credit, *available for use when and how you please*, at an **interest rate** that is relatively low…..many homeowners use their credit lines only for major items such as education, home improvements, or medical bills and not for day-to-day expenses…*Once approved for a home equity line of credit, you will be able to borrow up to your credit limit whenever you want.*" (*see* Exhibit E), Plaintiffs never had available lines of credit following the closing. In fact, however, because the option ARM loans were not sufficient to pay off Plaintiffs' existing mortgages and the substantial closing costs in connection with the refinancing, including the bogus TrueCost charges, the HELOC was in fact a second mortgage required to complete the refinancing resulting in the entire amount of the HELOC being completely depleted at closing. Thus, whatever existing equity Plaintiffs had in their homes was wiped out in the refinancing.

52.    Thus, the characterization of the HELOCs as an available line of credit that could be accessed with the checks provided to Plaintiffs through the mail was false. The unfortunate reality for the Plaintiffs is that the HELOC is a second "mortgage" carrying a higher adjustable interest rate than the loan they believed was

1  sufficient to refinance their existing loans and that is due to be repaid in a much

2  shorter time frame.

### RICO ALLEGATIONS

### The Enterprise

5      53.      Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

6      54.      Based upon Plaintiffs' current knowledge, the following persons

7  constitute a group of individuals associated in fact that will be referred to herein as the

8  "Lending Tree Enterprise": (1) Lending Tree; (2) Lending Tree Loans; and (3) LTSS.

9      55.      The Lending Tree Enterprise is an ongoing organization that engages

10  in, and whose activities affect, interstate commerce.  The members of the Lending

11  Tree Enterprise function as a continuing unit and share the common purpose of

12  exacting hidden fees from Plaintiffs and TrueCost Class members by inflating

13  TrueCost charges for specified closing costs.  Specifically:

14          (a)      Defendant Lending Tree operates an internet site that invites

15  consumers seeking mortgages to submit financial information for the purpose of

16  obtaining competing offers from lenders.  Notwithstanding these representations,

17  Lending Tree directs a portion of the leads received through the Lending Tree website

18  exclusively to Lending Tree Loans.  In this manner, Lending Tree has boosted its

19  earnings by increasing the number of loans originated by Lending Tree Loans.

20          (b)      Defendant Lending Tree Loans, in turn, has further increased its

21  revenues and those of its corporate parent, Lending Tree, by offering borrowers

22  "bundled" closing costs labeled TrueCost for specified closing costs through its

23  affiliate LTSS.  Although Lending Tree Loans represents that these closing costs are

24  "unavoidable" and "the same" regardless of the lender or loan chosen by the borrower,

25  in fact, the TrueCost charges are marked up to include a substantial hidden amount to

26  be pocketed by Lending Tree Loans, which provides none of the specified closing

27  services purportedly covered by the True Cost amount.

28

1        (c)    Defendant Lending Tree Loans collects the inflated TrueCost

2  charges from borrowers without disclosing the significant hidden amount for Lending

3  Tree Loans included therein.

4      56.    While Defendants conduct, participate in and are members and part of

5  the Lending Tree Enterprise, they also have an existence separate and distinct from the

6  enterprise. In this regard,

7        (a)    Consumers utilizing Lending Tree's website may be referred to

8  lenders other than Lending Tree Loans;

9        (b)    Although Lending Tree Loans derives loan originations principally

10  from requests received through the Lending Tree website, some loan requests are

11  received from third party sources. As to these loans, Lending Tree Loans operates

12  under the name HomeLoanCenter;

13        (c)    LTSS offers and provides real-estate secured settlement services to

14  lenders other than Lending Tree Loans.

15      57.    The Lending Tree Enterprise is an ongoing organization with an

16  ascertainable structure separate and apart from the pattern of racketeering activity in

17  which the Defendants engage, and its constituent members function as a continuing

18  unit. Specifically:

19        (a)    There is significant overlap in personnel and organizational

20  structure among the members of the enterprise. During the relevant period, Douglas

21  Lebda has served as the chairman of Lending Tree and Lending Tree Loans, and is

22  identified in annual reports filed with the State of Florida as a "manager" of LTSS. In

23  addition, for a portion of the Class Period, David Anderson served as a Senior Vice

24  President of Business Development at Lending Tree and Senior Vice President and

25  General Manager of LTSS;

26        (b)    There are significant financial connections among the members of

27  the enterprise. Lending Tree is the parent of Lending Tree Loans. LTSS began as a

28  joint venture between Lending Tree and Wachovia Corporation's Greenlink LLC. In

2005, Lending Tree LLC bought out Wachovia's interest in LTSS. The acquisition of Lending Tree Loans and launch of LTSS resulted in substantial additional revenue to Lending Tree. According to IAC's Form 10-K for the year ended December 31, 2005, filed with the Securities and Exchange Commission ("SEC"), Lending Tree's ability to close loans sourced through its website in its own name as a result of the acquisition of Lending Tree Loans resulted in a substantial increase in revenues per closing as Lending Tree's revenues grew 131% to $367.8 million for the fiscal year ended December 31, 2005. Likewise, according to IAC's Form 10-K for the year ended December 31, 2006, filed with the SEC, revenues from settlement services generated by LTSS contributed to a 17% growth in Lending Tree's revenues in 2006;

(c)     Douglas Lebda has led the Lending Tree companies throughout their existence including when they were part of IAC/Interactive;

(d)     Lending Tree provides a certain percentage of leads sourced through the Lending Tree website exclusively to Lending Tree Loans notwithstanding its representations to consumers that it would obtain competing loan proposals in response to inquiries from consumers;

(e)     LTSS provides bundled appraisal, flood insurance, title, and closing services for loans originated by Lending Tree Loans for a fee. The cost of these services are then marked up to include a substantial hidden amount to be pocketed by Lending Tree Loans, which provides none of the specified closing services purportedly covered by the True Cost amount;

(f)     Lending Tree Loans provides the inflated TrueCost charges to borrowers without disclosing the significant hidden amount for Lending Tree Loans included therein and misrepresents the charges as competitive and largely unavoidable regardless of the lender or loan chosen.

**PREDICATE ACTS**

58.     Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud).  As set forth below, Defendants have engaged, and continue to engage, in conduct violating each of these laws to effectuate their scheme.

59.     For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carriers, and received matter and things from the Postal Service or commercial interstate carriers, including, but not limited to, promotional materials, applications, agreements, correspondence and payments.  Among other things, these mailings included the Gaines and Cave Mortgage Documents described above in ¶¶ 11-12; 17; 22-23; 28.

60.     For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, the Defendants, in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things, including, but not limited to, promotional materials, applications, agreements, correspondence, and payments, and made or caused to be made false statements over the telephone, facsimile, electronic mail and internet.  Among other things, these uses of the wires included (i) Lending Tree's internet advertisements that there were no hidden fees and that banks would compete with respect to requests for credit submitted by consumers, (ii) the issuance of the press release regarding LTSS referenced in ¶ 40 above, and (iii) telephone conversations with borrowers in which Lending Tree Loans representatives using call scripts made misrepresentations regarding TrueCost charges as described in ¶ 42 above.  In addition, Ms. Gaines' closed her loan *via* fax as described in ¶ 10 above.

61.    Defendants' misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving Plaintiffs and the members of the TrueCost Class and obtaining their property for Defendants' gain.

62.    Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and Plaintiffs and members of the TrueCost Class relied upon the misrepresentations and omissions as set forth above.

63.    As a result, Defendants have obtained money and property belonging to the Plaintiffs and members of the True Cost Class, and Plaintiffs and members of the TrueCost Class have been injured by the Defendants' overt acts of mail and wire fraud.

## PATTERN OF RACKETEERING ACTIVITY

64.    Defendants have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing at least two acts of racketeering activity, *i.e.,* indictable violations of 18 U.S.C. §§ 1341 and 1343 as described in ¶¶ 11-18; 21-29 above, within the past four years.  In fact, each of the Defendants has committed thousands of acts of racketeering activity.  Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including Plaintiffs and members of the TrueCost Class.

65.    The multiple acts of racketeering activity that Defendants committed and/or conspired to commit were related to each other, and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

## RICO VIOLATIONS

66.    Section 1962(c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of

- 27 -

1  which affect, interstate or foreign commerce, to conduct or participate, directly or

2  indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering

3  activity ..."

4        67.    Through the patterns of racketeering activities outlined above, the

5  Defendants have conducted and participated in the affairs of the Lending Tree

6  Enterprise. Specifically:

7        (a)    Defendant Lending Tree operates an internet site that invites

8  consumers seeking mortgages to submit financial information for the purpose of

9  obtaining competing offers from lenders. Notwithstanding these representations,

10  Lending Tree directs a portion of the leads received through the Lending Tree website

11  exclusively to Lending Tree Loans. In this manner, Lending Tree has boosted its

12  earnings by increasing the number of loans originated by Lending Tree Loans.

13        (b)    Defendant Lending Tree Loans, in turn, has further increased its

14  revenues and those of its corporate parent, Lending Tree, by offering borrowers

15  "bundled" closing costs labeled TrueCost through its affiliate LTSS. Although

16  Lending Tree Loans represents these closing costs as "unavoidable" and "the same"

17  regardless of the lender or loan chosen by the borrower, in fact, the TrueCost charges

18  include a substantial hidden amount to be retained by Lending Tree Loans, which

19  provides none of the specified closing services purportedly covered by the True Cost

20  amount.

21        (c)    Defendant Lending Tree Loans collects the bogus TrueCost

22  charges from borrowers without disclosing the significant amount for Lending Tree

23  Loans included therein unrelated to settlement services.

24        68.    Section 1962(d) of RICO makes it unlawful "for any person to

25  conspire to violate any of the provisions of subsection (a), (b) or (c), of this section".

26        69.    Defendants' conspiracy to secure money from Plaintiffs and members

27  of the Classes for their own use through the fraudulent scheme described above

28  violates 18 U.S.C. § 1962(d).

70.    Each of the Defendants agreed to participate, directly or indirectly, in the conduct of the affairs of the Lending Tree Enterprise through a pattern of racketeering activity comprised of numerous acts of mail fraud and wire fraud, and each Defendant so participated in violation of 18 U.S.C. § 1962(c).

## CLASS ACTION ALLEGATIONS

71.    Pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on their own behalves and on behalf of the following nationwide classes of persons (the "Classes"):

(a)    All persons who obtained a mortgage loan from Defendant Lending Tree Loans who were quoted and charged a "TrueCost$^{SM}$" amount for settlement charges that included an undisclosed amount paid to Lending Tree Loans (the "TrueCost Class");

(b)    All persons who took out a HELOC along with their mortgages (the "HELOC Class") that was depleted upon the closing.

72.    Excluded from the Classes are Defendants, any entity in which a Defendant has a controlling interest or is a parent or subsidiary of, or any entity that is controlled by a Defendant, and any Defendant's officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns.

73.    Plaintiffs do not know the exact size or identities of the proposed Classes since such information is in the exclusive control of Defendants. Plaintiffs believe that the Classes encompass many thousands or tens of thousands of individuals who are geographically dispersed throughout the United States. Therefore, the proposed Classes are so numerous that joinder of all members is impracticable. The Classes are ascertainable, as the names and addresses of all members of the Classes can be identified from business records maintained by Defendants.

74.    All members of each of the Classes have been subject to and affected by the same practices and policies described herein. There are questions of law and

fact that are common to members of each of the Classes, and predominate over any questions affecting only individual members of the Classes. These questions include, but are not limited to, the following:

- Whether Defendants engaged in a scheme to artificially inflate the settlement costs charged to Plaintiffs and TrueCost Class members;

- Whether Lending Tree Loans fraudulently induced Plaintiffs and members of the HELOC Class to take out a HELOC along with their mortgages;

- Whether Lending Tree Loans has breached its implied duty of good faith and fair dealing;

- Whether Defendants conspired in furtherance of the unlawful acts alleged herein;

- Whether Defendants have engaged in mail and wire fraud;

- Whether Defendants engaged in a pattern of racketeering activity;

- Whether the Lending Tree Enterprise is an enterprise within the meaning of 18 U.S.C. § 1961(4);

- Whether Defendants conducted or participated in the affairs of the Lending Tree Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c);

- Whether Defendants' overt and/or predicate acts in furtherance of the conspiracy and/or direct acts in violation of 18 U.S.C. § 1962(c) proximately caused injury to the Plaintiffs' and Class members' business or property;

- Whether Defendants have violated the UCL;

- Whether Defendants have violated the FAL;

- Whether Defendants have violated the CLRA;

- Whether Defendants have been unjustly enriched;

1       • Whether the Court can enter declaratory and injunctive relief; and

2       • The proper measure of damages.

3       75.      The claims of the named Plaintiffs are typical of the claims of the

4   Classes and do not conflict with the interests of any other members of the Classes in

5   that both the Plaintiffs and the other members of the Classes were subject to the same

6   wrongful policies and practices by Defendants.

7       76.      The individual named Plaintiffs will fairly and adequately represent the

8   interests of each member of the Classes.  They are committed to the vigorous

9   prosecution of the claims of the Classes and have retained attorneys who are qualified

10  to pursue this litigation and have experience in class actions.

11      77.      The prosecution of separate actions by individual members of the

12  Classes would create a risk of adjudications with respect to individual members of the

13  Classes which would, as a practical matter, be dispositive of the interests of other

14  members of the Classes who are not parties to the action, or could substantially impair

15  or impede their ability to protect their interests.

16      78.      The prosecution of separate actions by individual members of the

17  Classes would create a risk of inconsistent or varying adjudications with respect to

18  individual members of the Classes, which would establish incompatible standards of

19  conduct for the parties opposing the Classes.  Such incompatible standards and

20  inconsistent or varying adjudications, on what would necessarily be the same essential

21  facts, proof and legal theories, would also create and allow to exist inconsistent and

22  incompatible rights within the Classes.

23      79.      The Defendants have acted or refused to act on grounds generally

24  applicable to each member of the Classes, making final declaratory or injunctive relief

25  appropriate.

26      80.      The questions of law and fact common to members of the Classes

27  predominate over any questions affecting only individual members.

28

1        81.     Notice to the proposed Classes can be achieved through the U.S. mail

2  to the addresses of the members of the Classes that are kept within Defendants'

3  records. Notice can also be supplemented *via* publication.

4        82.     A class action is superior to other available methods for the fair and

5  efficient adjudication of the controversies herein in that:

6              &bull;  Individual claims by the members of the Classes are impractical as

7                  the costs of pursuit far exceed what any one individual Plaintiff or

8                  Class member has at stake;

9              &bull;  As a result, individual members of the Classes have no interest in

10                 prosecuting and controlling separate actions;

11              &bull;  It is desirable to concentrate litigation of the claims herein in this

12                 forum; and

13              &bull;  The proposed class action is manageable.

14                  **CAUSES OF ACTION**

15                     **COUNT I**

16  **AGAINST ALL DEFENDANTS ON BEHALF OF THE TRUECOST CLASS**

17           **VIOLATION OF RICO 18 U.S.C. § 1962(C)**

18        83.     Plaintiffs incorporate and reallege the paragraphs above as if fully set

19  forth herein.

20        84.     This claim for relief arises under 18 U.S.C. § 1964(c).

21        85.     As set forth above, Defendants have violated 18 U.S.C. § 1962(c) by

22  conducting, or participating directly or indirectly in the conduct of, the affairs of the

23  Lending Tree Enterprise through a pattern of racketeering.

24        86.     As a direct and proximate result, Plaintiffs and members of the

25  TrueCost Class have been injured by the predicate acts which make up the

26  Defendants' patterns of racketeering activity.

27        87.     Specifically, Plaintiffs and members of the TrueCost Class have been

28  injured by each paying hundreds of dollars in bogus closing costs.

## COUNT II

## AGAINST ALL DEFENDANTS ON BEHALF OF THE TRUECOST CLASS

## VIOLATION OF RICO 18 U.S.C. § 1962(D) BY

## CONSPIRING TO VIOLATE 18 U.S.C. § 1962(C)

88.     Plaintiffs incorporate and reallege the paragraphs above as if fully set forth herein.

89.     This claim for relief arises under 18 U.S.C. § 1964(c).

90.     In violation of 18 U.S.C. § 1962(d), Defendants have, as set forth above, conspired to violate:  18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of the affairs of the Lending Tree Enterprise through a pattern of racketeering.

91.     As a direct and proximate result, Plaintiffs and members of the TrueCost Class have been injured by the predicate acts which make up the Defendants' patterns of racketeering.

92.     Specifically, Plaintiffs and TrueCost Class members have been injured by each paying hundreds of dollars in bogus closing costs.

## COUNT III

## AGAINST ALL DEFENDANTS ON BEHALF OF THE TRUECOST CLASS

## VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS

## CODE §17200 – UNLAWFUL BUSINESS ACTS AND PRACTICES

93.     Plaintiffs incorporate and reallege the paragraphs above as if fully set forth herein.

94.     Defendants misconduct as alleged herein, including the making of false and misleading representations to consumers, which constitutes unlawful business practices under the UCL, occurred in significant part in California.  In particular, because Defendants' misconduct was devised, implemented and directed from Lending Tree Loan's headquarters and Lending Tree LLC's offices in California, the UCL applies to a class of consumers, both within and outside of

- 33 -

California, who have been harmed as a result. Moreover, California has a substantial interest in preventing unlawful business acts and practices within the State which may have an effect both in California and throughout the rest of the country.

95.    Such acts of Defendants, as described above, and each of them, constitute unlawful business acts and practices. Defendants' acts and business practices alleged above are unlawful under RICO.

96.    As a result of Defendants' unlawful business acts and practices alleged above, Plaintiffs and members of the TrueCost Class have been injured in their business or property by each paying hundreds of dollars in bogus closing costs.

97.    Plaintiffs' claims and the claims of the TrueCost Class involve questions of common and general interest.

98.    Plaintiffs and Class members would not have paid the TrueCost charges absent Defendants' unlawful business acts and practices alleged above.

99.    Plaintiffs and members of the TrueCost Class have suffered losses of money and property as a result of Defendants' unlawful acts and business practices alleged above. As a result of Defendants' violations of the UCL, Plaintiffs and members of the TrueCost Class are entitled to bring this claim for disgorgement and to recover restitution, reasonable attorneys' fees, and costs and other injunctive or declaratory relief as may be available.

## COUNT IV

### AGAINST ALL DEFENDANTS ON BEHALF OF THE
### TRUECOST AND HELOC CLASSES
### VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS
### CODE §17200 – UNLAWFUL BUSINESS ACTS AND PRACTICES

100.    Plaintiffs incorporate and reallege ¶¶ 1-3; 11-30; 40-52 above as if fully set forth herein.

101.    Defendants misconduct as alleged herein, including the making of false and misleading representations to consumers, which constitutes unlawful

1  business practices under the UCL, occurred in significant part in California.   In
2  particular, because Defendants' misconduct was devised, implemented and directed
3  from Lending Tree Loan's headquarters and Lending Tree LLC's offices in
4  California, the UCL applies to a class of consumers, both within and outside of
5  California, who have been harmed as a result.  Moreover, California has a substantial
6  interest in preventing unlawful business acts and practices within the State which may
7  have an effect both in California and throughout the rest of the country.

8      102.    Such acts of Defendants, as described above, and each of them,
9  constitute unlawful business acts and practices.  Defendants' acts and business
10  practices alleged above are unlawful under the Consumers Legal Remedy Act, Cal.
11  Civ. Code § 1750, *et seq.* and California's False Advertising Law, Cal. Bus. & Prof.
12  Code § 17500, *et seq.*

13      103.    As a result of Defendants' unlawful business acts and practices alleged
14  above, Plaintiffs and members of the Classes have been injured as follows:   first,
15  members of the TrueCost Class have each paid hundreds of dollars in bogus closing
16  costs; second, members of the HELOC Class find themselves saddled with a second
17  "mortgage" carrying a higher adjustable interest rate than the loan they believed was
18  sufficient to refinance their existing loans and that is due to be repaid in a much
19  shorter time frame.

20      104.    Plaintiffs' claims and the claims of the Classes involve questions of
21  common and general interest.

22      105.    Plaintiffs and Class members would not have paid the TrueCost
23  charges or taken out the HELOC loans absent Defendants' unlawful business acts and
24  practices alleged above.

25      106.    Plaintiffs and members of the Classes have suffered losses of money
26  and property as a result of Defendants' unlawful acts and business practices alleged
27  above.  As a result of Defendants' violations of the UCL, Plaintiffs and members of
28  the Classes are entitled to bring this claim for disgorgement and to recover restitution,

1  reasonable attorneys' fees, and costs and other injunctive or declaratory relief as may

2  be available.

3  **COUNT V**

4  **AGAINST ALL DEFENDANTS ON BEHALF OF THE**

5  **TRUECOST AND HELOC CLASSES**

6  **VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS**

7  **CODE §17200, *ET SEQ.* – UNFAIR BUSINESS ACTS AND PRACTICES**

8      107.   Plaintiffs incorporate and reallege ¶¶ 1-3; 11-30; 40-52 above as if

9  fully set forth herein.

10      108.   As set forth above, Defendants' misconduct as alleged herein,

11  including the making of false and misleading representations to borrowers, which

12  constitutes unfair business practices under the UCL, occurred in significant part in

13  California,. In particular, because Defendants' misconduct was devised, implemented

14  and directed from Lending Tree Loan's headquarters and Lending Tree LLC's offices

15  in California, the UCL applies to a class of borrowers, both within and outside of

16  California, who have been harmed as a result. Moreover, California has a substantial

17  interest in preventing unfair business acts and practices within the State which may

18  have an effect both in California and throughout the rest of the country.

19      109.   Such acts of Defendants, as described above, and each of them,

20  constitute unfair business acts and practices because they are immoral, unscrupulous,

21  and offend public policy and are substantially injurious to consumers.

22      110.   As a result of Defendants' unfair business acts and practices alleged

23  above, Plaintiffs and members of the Classes have been injured as follows: first,

24  members of the TrueCost Class have each paid hundreds of dollars in bogus closing

25  costs; second, members of the HELOC Class find themselves saddled with a second

26  "mortgage" carrying a higher adjustable interest rate than the loan they believed was

27  sufficient to refinance their existing loans and that is due to be repaid in a much

28  shorter time frame.

111.    Plaintiffs and Class members would not have paid the TrueCost charges or taken out the HELOC loans absent Defendants' unfair business acts and practices alleged above.

112.    Plaintiffs and members of the Classes have suffered losses of money and property as a result of Defendants' unfair acts and business practices alleged above. As a result of Defendants' violations of the UCL, Plaintiffs and members of the Classes are entitled to bring this claim for disgorgement and to recover restitution, reasonable attorneys' fees, and costs and other injunctive or declaratory relief as may be available.

## COUNT VI

### AGAINST ALL DEFENDANTS ON BEHALF OF THE
### TRUECOST AND HELOC CLASSES
### VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS
### CODE §17200. – FRAUDULENT BUSINESS ACTS AND PRACTICES

113.    Plaintiffs incorporate and reallege the paragraphs ¶¶ 1-3; 11-30; 40-52 above as if fully set forth herein.

114.    As set forth above, Defendants' scheme included making false and misleading representations to borrowers, occurring in significant part in California, which constitutes fraudulent business practices under the UCL. In particular, because Defendants' scheme was devised, implemented and directed from Lending Tree's headquarters in California, the UCL applies to a class of consumers, both within and outside of California, who have been harmed as a result. Moreover, California has a substantial interest in preventing fraudulent business acts and practices within the State which may have an effect both in California and throughout the rest of the country.

115.    Such acts of Defendants, as described above, and each of them, constitute fraudulent business acts and practices because they deceived Plaintiffs and Class members regarding the true nature of the TrueCost charges and HELOC loans.

- 37 -

116.    As a result of Defendants' fraudulent business acts and practices alleged above, Plaintiffs and members of the Classes and the HELOC Class have been injured in their business or property as follows:  first, members of the TrueCost Class have each paid hundreds of dollars in bogus closing costs; second, members of the HELOC Class find themselves saddled with a second "mortgage" carrying a higher adjustable interest rate than the loan they believed was sufficient to refinance their existing loans and that is due to be repaid in a much shorter time frame.

117.    Plaintiffs and Class members would not have paid the TrueCost charges or taken out the HELOC loans absent Defendants' fraudulent business acts and practices alleged above.

118.    Plaintiffs and members of the Classes have suffered losses of money and property as a result of Defendants' fraudulent acts and business practices alleged above.  As a result of Defendants' violations of the UCL, Plaintiffs and members of the Classes are entitled to bring this claim for disgorgement and to recover restitution, reasonable attorneys' fees, and costs and other injunctive or declaratory relief as may be available.

## COUNT VII

### AGAINST ALL DEFENDANTS ON BEHALF OF THE
### TRUECOST AND HELOC CLASSES
### VIOLATION OF CALIFORNIA BUSINESS
### AND PROFESSIONS CODE §17500, *ET SEQ.*

119.    Plaintiffs incorporate and reallege ¶¶ 1-3; 11-30; 40-52 above as if fully set forth herein.

120.    California Business & Professions Code §17500 prohibits various deceptive practices in connection with the dissemination in any manner of representations for the purpose of inducing, or which are likely to induce, directly or indirectly, customers to purchase goods or services such as the ones here at issue.

121. The acts, practices, misrepresentations and omissions alleged herein were intended to, and did, induce the consuming public to purchase the aforementioned goods and services from Defendants and violated and continue to violate Business & Professions Code §17500, in that Defendants caused advertisements to be placed before the general public but Defendant's products and services did not conform to the advertisements.

122. As a result, Defendants violated California's FAL because their misconduct involved deceptive, untrue and misleading advertising. In particular, because Defendants' misconduct was devised, implemented and directed from Lending Tree Loan's headquarters and Lending Tree LLC's offices in California, the FAL applies to a class of consumers, both within and outside of California, who have been harmed as a result. Moreover, California has a substantial interest in preventing fraudulent practices within the State which may have an effect both in California and throughout the rest of the country.

123. Specifically, Plaintiffs and members of the Classes have been injured as follows: first, members of the TrueCost Class have each paid hundreds of dollars in bogus costs; second, members of the HELOC Class find themselves saddled with a second "mortgage" carrying a higher adjustable interest rate than the loan they believed was sufficient to refinance their existing loans and that is due to be repaid in a much shorter time frame.

124. Defendants should be ordered to disgorge and make restitution to Plaintiffs and members of the Classes from the excessive payments and profits obtained at their expense.

//
//
//
//
//

**COUNT VIII**

**AGAINST ALL DEFENDANTS ON BEHALF OF THE**

**TRUECOST AND HELOC CLASSES**

**VIOLATION OF CALIFORNIA'S CLRA**

**CAL. CIV. CODE §1750, *ET SEQ.***

125.    Plaintiffs reallege and incorporate by reference ¶¶ 1-3; 11-30; 40-52 above as if fully set forth herein.

126.    This cause of action is brought pursuant to the CLRA and seeks relief for the sale or lease of goods or services to consumers.

127.    Defendants' actions, omissions, representations and conduct have violated, and continue to violate, the CLRA because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

128.    Plaintiffs are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d).

129.    The HELOCs and settlement services were "goods" and/or "services" within the meaning of California Civil Code § 1761(a) and (b).

130.    By engaging in the actions, representations and conduct set forth in this complaint, Defendants have violated, and continue to violate, § 1770(a)(5) of the CLRA. Specifically, in violation of California Civil Code § 1770(a)(5), Defendants' acts and practices constitute unfair methods of competition and unfair or deceptive acts or practices in that they misrepresent the characteristics and benefits of the loans and services in question.

131.    By engaging in the actions, representations and conduct set forth in this complaint, Defendants have violated, and continue to violate, § 1770(a)(7) of the CLRA. Specifically, in violation of California Civil Code § 1770(a)(7), Defendants' acts and practices constitute unfair methods of competition and unfair or deceptive

1   acts or practices in that they misrepresent the particular standard, quality or grade of
2   the goods or services.

3       132.   By engaging in the actions, representations and conduct set forth in this
4   complaint, Defendants have violated, and continue to violate, § 1770(a)(9) of the
5   CLRA. Specifically, in violation of California Civil Code § 1770(a)(9), Defendants'
6   acts and practices constitute unfair methods of competition and unfair or deceptive
7   acts or practices in that they advertised goods and services with the intent not to sell
8   them as advertised.

9       133.   By engaging in the actions, representations and conduct set forth in this
10  Class Action Complaint, Defendants have violated, and continue to violate,
11  §1770(a)(14) of the CLRA.   Specifically, in violation of California Civil Code
12  §1770(a)(14), Defendants' acts and practices constitute unfair methods of competition
13  and unfair or deceptive acts or practices in that they represent that a transaction
14  confers or involves rights, remedies, or obligations which it does not have or involve,
15  or which are prohibited by law.

16      134.   By engaging in the actions, representations and conduct set forth in this
17  Class Action Complaint, Defendants have violated, and continue to violate,
18  §1770(a)(16) of the CLRA.   Specifically, in violation of California Civil Code
19  §1770(a)(16), Defendants' acts and practices constitute unfair methods of competition
20  and unfair or deceptive acts or practices in that they represent that the subject of a
21  transaction has been supplied in accordance with a previous representation when it has
22  not.

23      135.   Plaintiffs request that this Court enjoin Defendants from continuing to
24  employ the unlawful methods, acts and practices alleged herein pursuant to California
25  Civil Code § 1780(a)(2).  If Defendants are not restrained from engaging in these
26  types of practices in the future, Plaintiffs, members of the Classes, and other members
27  of the general public will continue to suffer harm.

28

136.     CLRA §1782 NOTICE. On July 9, 2008, Plaintiffs sent Defendants a CLRA notice letter that provided notice of Defendants' violation of the CLRA and demanded that within thirty (30) days from that date, Defendants correct, repair, replace or other rectify the unlawful, unfair, false and/or deceptive practices complained of herein. The letter also stated that if Defendants refused to do so, Plaintiffs would amend their complaint to seek damages in accordance with the CLRA. Defendants have failed to comply with the letter and rectify the practices.

137.     Pursuant to California Civil Code §1780(a)(3), Plaintiffs, on behalf of themselves and all other members of the Classes, seek compensatory damages, punitive damages and restitution of any ill-gotten gains due to Defendants' acts and practices.

138.     Plaintiffs also request that this Court award their costs and reasonable attorneys' fees pursuant to Cal. Civ. Cod §1780(d).

## COUNT IX

### AGAINST LENDING TREE LOANS

### ON BEHALF OF THE TRUECOST AND HELOC CLASSES

### BREACH OF CONTRACT

139.     Plaintiffs reallege and incorporate by reference ¶¶ 1-3; 11-30; 40-52 above as if fully set forth herein.

140.     Plaintiffs and other members of the TrueCost Class entered agreements drafted by Lending Tree Loans whereby Defendant Lending Tree Loans presented Plaintiffs and other borrowers (the "TrueCost Class") with an amount for non-recurring closing costs (*e.g.*, appraisal, credit report, notary, settlement, and title insurance fees) that would be paid to Lending Tree Settlement Services ("LTSS"), which Lending Tree Loans characterized as the "TrueCost$^{SM}$" of closing the loans. Defendant Lending Tree Loans breached these agreements by charging Plaintiffs costs that were not in fact "true" costs, but inflated to include a significant hidden amount that was retained by Lending Tree Loans, separate and apart from the amounts

1    necessary to pay the non-recurring closing costs in connection with the loans. In other

2    words, far from the "true" amount of closing costs, a portion of the "TrueCost^SM"

3    closing charges paid by Plaintiffs and TrueCost Class Members was simply an

4    undisclosed amount pocketed by Lending Tree Loans, unrelated to any specified

5    settlement services.

6        141.    Plaintiffs and other members of the HELOC Class entered into

7    HELOC agreements drafted by Defendant Lending Tree Loans based upon the

8    representation that the HELOC was a necessary condition to receive a low interest rate

9    mortgage and that the HELOC would provide Plaintiffs with a line of available credit.

10   Defendant Lending Tree Loans breached this agreement because (a) the HELOC was

11   not necessary to obtain a low interest loan, and (b) there was no credit available on the

12   HELOC as Defendant Lending Tree Loans drew down the entire amount of the

13   HELOC at closing, leaving no credit available and subjecting Plaintiffs to the higher

14   interest rate of the HELOC.

15       142.    As a result of Defendant Lending Tree Loans' breaches, Plaintiffs and

16   members of the Classes have been injured as follows: first, members of the TrueCost

17   Class have each paid hundreds of dollars in bogus closing costs; second, members of

18   the HELOC Class find themselves saddled with a second "mortgage" carrying a

19   higher adjustable interest rate than the loan they believed was sufficient to refinance

20   their existing loans and that is due to be repaid in a much shorter time frame.

21                               **COUNT X**

22                   **AGAINST LENDING TREE LOANS**

23       **ON BEHALF OF THE TRUECOST AND HELOC CLASSES**

24             **BREACH OF IMPLIED COVENANT OF**

25                 **GOOD FAITH AND FAIR DEALING**

26       143.    Plaintiffs reallege and incorporate by reference ¶¶ 1-3; 11-30; 40-52

27   above as if fully set forth herein.

28

144. California law implies a covenant of good faith and fair dealing in every contract. The implied covenant imposes on contracting parties the obligation to discharge their contractual obligations fairly and in good faith.

145. Plaintiffs and members of the Classes did all, or substantially all of the significant things their agreements with Lending Tree Loans required. Lending Tree Loans' conduct as set forth above unfairly interfered with the right of Plaintiffs and members of the Classes to receive the benefits of the agreements they signed.

146. As a result of Defendant's breach of the covenant of good faith and fair dealing implied, Plaintiffs and members of the Classes have been injured in their as follows: first, members of the TrueCost Class have each paid hundreds of dollars in bogus closing costs; second, members of the HELOC Class find themselves saddled with a second "mortgage" carrying a higher adjustable interest rate than the loan they believed was sufficient to refinance their existing loans and that is due to be repaid in a much shorter time frame.

**COUNT XI**

**AGAINST ALL DEFENDANTS**

**ON BEHALF OF THE TRUECOST AND HELOC CLASSES**

**UNJUST ENRICHMENT**

147. Plaintiffs incorporate and reallege ¶¶ 1-3; 11-30; 40-52 above as if fully set forth herein.

148. Defendants' misconduct unjustly enriched Defendants, to the detriment of the Classes, by causing Defendants to receive excessive monetary payments from Plaintiffs and the Classes.

149. Specifically, Plaintiffs and members of the Classes have been injured in a variety of ways, including paying bogus closing costs and paying the high interest rates of the HELOC.

150. Defendants' retention of funds paid by Plaintiffs and members of the Classes violates the fundamental principles of justice, equity, and good conscience.

151.    Accordingly, Defendants should be ordered to return any funds obtained as a result of their misconduct to the Classes.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

(a)    Certification of the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as the representatives of the Classes, and designating their counsel as counsel for the Classes;

(b)    A declaration that Defendants have committed the violations alleged herein;

(c)    An award of treble the amount of damages suffered by Plaintiffs and members of the TrueCost Class as proven at trial plus interest and attorneys' fees and expenses pursuant to 18 U.S.C. § 1962(c) and (d);

(d)    Ordering Defendants to disgorge the payments and profits they wrongfully obtained at the expense of Plaintiffs and members of the Classes;

(e)    Ordering that restitution be made to Plaintiffs and members of the Classes for Defendants' unjust enrichment;

(f)    Ordering that an accounting be made by Defendants of their wrongfully obtained payments and profits;

(g)    An injunction preventing Defendants from engaging in future fraudulent practices;

(h)    For declaratory and injunctive relief pursuant to California Civil Code §1780;

(i)    Costs of this action, including reasonable attorneys' fees and expenses; and

(j)    Any such other and further relief as this Court deems just and proper.

1

## DEMAND FOR JURY TRIAL

2    Plaintiff hereby demands a jury trial on all issues so triable as provided by Rule

3    38(a) of the Federal Rules of Civil Procedure.

4    DATED:    November 11, 2009              Respectfully submitted,

5

6                                            **REESE RICHMAN LLP**

7

8                                            Michael R. Reese
                                             Kim E. Richman
9                                            Belinda L. Williams
                                             875 Avenue of the Americas, 18th Floor
10                                           New York, New York 10001
                                             Telephone:  (212) 643-0500
11                                           Facsimile:  (212) 253-4272

12
                                             **WHATLEY DRAKE
13                                             & KALLAS, LLC**
                                             Deborah Clark-Weintraub
14                                           1540 Broadway, 37th Floor
                                             New York, New York  10036
15                                           Telephone:  (212) 447-7070
                                             Facsimile:  (212) 447-7077
16

17                                           **LANGE & KONCIUS**
                                             Joseph J.M. Lange
18                                           Jeffrey A. Koncius
                                             222 North Sepulveda, Suite 1560
19                                           El Segundo, California 90245
                                             Telephone:  (310) 414-1880
20                                           Facsimile:  (310) 414-1882

21

22                                           *Counsel for Plaintiffs*

23

24

25

26

27

28

# EXHIBIT A

# EXHIBIT A - GAINES

 

**REDACTED**

**HomeLoanCenter.com**
A LendingTree Company

## 30 Day Lock-In Disclosure & Agreement

Home Loan Center, Inc., dba LendingTree Loans     ("Lender") has established a Lock Program to permit you to lock-in both the interest rate and specified closing costs ("TrueCost™") on your requested loan. The Lock Program protects you against fluctuations in the home loan market by guaranteeing your loan terms for a specific period of time. Lender acknowledges that you have paid Lender a lock-in fee in order to qualify for this program on the loan terms set forth below.  This lock-in fee is not refundable except as specifically provided herein.  However, if your loan closes upon the terms stated below, Lender agrees to provide you a credit against your closing costs in the amount of the lock-in fee.

| Borrower Information | | Locked-In Loan Terms: | | |
|---|---|---|---|---|
| Loan Number: | | Expiration Date:  11/30/06 | Program Code: | |
| Name of Borrower: | Carl Gaines | Loan Program:   JUMBO 1 MTA | | |
| Name of Co-Borrower: | Joanne Gaines | Documentation Type:  Stated | | |
| Property Address: | 3521 Grace Avenue | Loan Amount:  $ 319,000.00 | Interest Rate: | 1.7000  % |
| City: | Bronx | Margin: | 3.2500  % | |
| State, Zip: | New York, 10466 | Cap: | 0.0000  % | |
| Occupancy: | Owner | Impounds/Escrow:  Yes | | |
| Property Type: | Detached SFR    No. of Units:    1 | Loan Origination: | 0.0000  % | |
| Estimated Value: $ | 400,000.00 | Discount Points: | 1.2500  % | |
| Loan to Value: | 79.7500  % | Prepay Term (Yrs): | 0 | |
| Combined LTV: | 79.7500  % | Lock Deposit: $  0.00 | | |
| Loan Purpose: | C/O Refi | | $ | |
| Refinance Purpose: | Cashout /Other | | $ | |
| Lock-In Date: | 10/31/06 | **Total TrueCost ** **: $ 3,500.00 | | |

**On refinance loans, TrueCost™ does not include origination points, discount points, prepaid interest, county recording fees, insurance binder fees, HOA certification fees, and impounds for real estate taxes and insurance. TrueCost™ also does not include any fees or late charges demanded by your prior lender for subordination or payoff of your prior loan including reconveyance fees or any charge related to the preparation or delivery of the payoff demand statement. Some states, counties and municipalities require the payment of a mortgage tax at the closing of your loan. TrueCost™ does not include any applicable mortgage/property taxes, intangible taxes, documentary transfer taxes, or a tax of any kind. All escrow fees are included in TrueCost™ except fees to prepare a vesting/transfer deed, and courier fees/wire fees where you request expedited delivery of funds via overnight mail or bank wire. If a 442 final inspection is required for your property, this fee will not be included in TrueCost™.
***If your loan is a purchase transaction, TrueCost™ also does not include Title Insurance charges, Appraisal Fee, and Escrow charges.

Lender has delivered to you a loan application "checklist" concurrently with the delivery of this lock this lock-in Disclosure. YOU MUST RETURN ALL OF THE DOCUMENTS LISTED ON THE CHECKLIST WITHIN THREE (3) CALENDAR DAYS OF THE LOCK-IN DATE STATED ABOVE. IN ADDITION, YOU  MUST RETURN ANY FOLLOW UP DOCUMENTATION REQUESTED BY LENDER WITHIN ONE (1) DAY OF SUCH REQUEST.  IF YOU FAIL TO SUBMIT THIS DOCUMENTATION WITHIN THE FOREGOING TIME FRAME, YOUR INTEREST RATE IS SUBJECT TO INCREASE TO REFLECT CURRENT MARKET RATES AND YOU WILL NOT BE ENTITLED TO A REFUND OF YOUR LOCK FEE IN SUCH EVENT.

Although the Lock Program locks in the interest rate and TrueCost™ on your requested loan, this does not guarantee that your loan will close. Your loan application has received preliminary approval based on your Borrower information shown above and other information provided to us by you during the application process. However, prior to closing your loan, Lender must verify property approval, property conditions, mortgage insurance (if applicable), clear title, and certain other information that may be requested in order to evaluate your ability and willingness to meet your credit obligations and the value and conditions of the property.

Please be aware that Lender does not warrant the lock-in period against any delays in processing and Lender is under no obligation to extend your lock-in period to close the loan on the terms stated herein.  Because of this, it is imperative that you provide Lender all documentation requested to complete the review of your loan application within the time frames stated above. In locking this loan, Lender has relied on the accuracy of the application information you have provided during the application process. In the event that Lender is not able to close this loan and all of your documentation and information supports and is consistent with the data you provided Lender during the application process, then you will receive a refund of your lock-in fee. Your lock-in fee will not be refunded for any other reason, including the receipt of a property appraisal below the estimated value stated above.  The maximum liability for either party hereunder is the above-stated lock-in fee.

This agreement may only be modified or amended by a written agreement signed by a corporate officer of Lender and you.  If you have any questions regarding this Lock-In Disclosure, the Checklist, or any other issue concerning your loan, please contact your Mortgage Banker at (800) 942-3683.

| Applicant(s) to Complete and Sign | |
|---|---|
| Amount: $: 400.00 | Credit Card No: |
| Name on Card: | Expiration Date: |

I/We understand this rate lock will be void and of no force or effect unless a signed copy of the Lock-In Disclosure & Agreement is returned to the loan representative by facsimile or other acceptable delivery method within 24 hours from the time that the interest rate is locked.

_Carl Gaines_ _____  11/4/06     _Joanne Gaines_ _____  11/4/06
Carl Gaines              Date            Joanne Gaines             Date

_____ Date            _____ Date

_Jamie Cassellberry_ _____  Date
MORTGAGE BANKER  Theresa Blaskovich         Date        _____ Date

**CONFIDENTIAL**
HLC 000434

# EXHIBIT A - CAVE

**HomeLoanCenter.com**
A LendingTree Company

# 30 Day Lock-In Disclosure & Agreement

Home Loan Center, Inc., dba LendingTree Loans  ("Lender") has established a Lock Program to permit you to lock-in both the interest rate and specified closing costs ("TrueCost(SM)") on your requested loan. The Lock Program protects you against fluctuations in the home loan market by guaranteeing your loan terms for a specific period of time. Lender acknowledges that you have paid Lender a lock-in fee in order to qualify for the program on the loan terms set forth below.  This lock-in fee is not refundable except as specifically provided herein.  However, if your loan closes upon the terms stated below, Lender agrees to provide you a credit against your closing costs in the amount of the lock-in fee.

| Borrower Information: | | Locked-In Loan Terms: | |
|---|---|---|---|
| Loan Number: | | Expiration Date:  10/26/06 | Program Code: |
| Name of Borrower: | Johnnie M. Cave | Loan Program:  JUMBO 1 MTA | |
| Name of Co-Borrower: | | Documentation Type:  Stated | |
| Property Address: | 5042 Pennbrook Drive | Loan Amount:$  179,200.00 | Interest Rate:  2.0000  % |
| City: | Chesterfield | Margin:  3.4500  % | |
| State, Zip: | Virginia, 23832 | Cap:  0.0000  % | |
| Occupancy: | Owner | Impounds/Escrow:  Yes | |
| Property Type: | Detached SFR    No. of Units:  1 | Loan Origination:  0.0000  % | |
| Estimated Value: $ | 224,000.00 | Discount Points:  0.7400  % | |
| Loan to Value: | 80.0000  % | Prepay Term (Yrs):  3 | |
| Combined LTV: | 90.0000  % | Lock Deposit: $  400.00 | |
| Loan Purpose: | C/O Refi | $ | |
| Refinance Purpose: | Cashout /Other | $ | |
| Lock-in Date: | 9/26/06 | **Total TrueCost SM **:$ 2,500.00 | |

**On refinance loans, TrueCost(SM) does not include origination points, discount points, prepaid interest, county recording fees, insurance binder fee, HOA certification fees, and impounds for real estate taxes and insurance. TrueCost(SM) also does not include any fees or late charges demanded by your prior lender for subordination or payoff of your prior loan including reconveyance fees or any charge related to the preparation or delivery of the payoff demand statement.  Some states, counties and municipalities require the payment of a mortgage tax at the closing of your loan.  TrueCost(SM) does not include any applicable mortgage/property taxes, intangible taxes, documentary transfer taxes, or a tax of any kind.  All escrow fees are included in TrueCost(SM) except fees to prepare a vesting/transfer deed, and courier fees/wire fees where you request expedited delivery of funds via overnight mail or bank wire.  If a 442 final inspection is required for your property, this fee will not be included in TrueCost(SM).

***If your loan is a purchase transaction, TrueCost(SM) also does not include Title Insurance charges, Appraisal Fee, and Escrow charges.

Lender has delivered to you a loan application "checklist" concurrently with the delivery of this lock lock-in Disclosure. **YOU MUST RETURN ALL OF THE DOCUMENTS LISTED ON THE CHECKLIST WITHIN THREE (3) CALENDAR  DAYS OF THE LOCK-IN DATE STATED ABOVE.  IN ADDITION, YOU  MUST RETURN ANY FOLLOW UP  DOCUMENTATION REQUESTED BY LENDER WITHIN ONE (1) DAY OF SUCH REQUEST.  IF YOU FAIL TO SUBMIT THIS DOCUMENTATION WITHIN THE FOREGOING TIME FRAME, YOUR INTEREST RATE IS SUBJECT TO INCREASE TO REFLECT CURRENT MARKET RATES AND YOU WILL NOT BE ENTITLED TO A REFUND OF YOUR LOCK FEE IN SUCH EVENT.**

Although the Lock Program locks in the interest rate and TrueCost(SM) on your requested loan, this does not guarantee that your loan will close. Your loan application has received preliminary approval based on your Borrower information shown above and other information provided to us by you during the application process. However, prior to closing your loan, Lender must verify property value, property conditions, mortgage insurance (if applicable), clear title, and certain other information that may be requested in order to evaluate your ability and willingness to meet your credit obligations and the value and conditions of the property.

Please be aware that Lender does not warrant the lock-in period against any delays in processing and Lender is under no obligation to extend your lock-in period to close the loan on the terms stated herein.  Because of this, it is imperative that you provide Lender all documentation requested to complete the review of your loan application within the time frames stated above.  In locking this loan, Lender has relied on the accuracy of the application information you have provided during the application process.  In the event that Lender is not able to close this loan and all of your documentation and information supports and is consistent with the data you provided Lender during the application process, then you will receive a refund of your lock-in fee.  Your lock-in fee will not be refunded for any other reason, including the receipt of a property appraisal below the estimated value stated above.  The maximum liability for either party hereunder is the above-stated lock-in fee.

This agreement may only be modified or amended by a written agreement signed by a corporate officer of Lender and you.  If you have any questions regarding this Lock–In Disclosure, the Checklist, or any other issue concerning your loan, please contact your Mortgage Banker at (800) 942-3683.

**Applicant(s) to Complete and Sign**

Amount:  $:  400.00 _____    Credit Card No: _____

Name on Card: _____    Expiration Date: _____

I/We understand this rate lock will be void and of no force or effect unless a signed copy of the Lock-in-Disclosure & Agreement is returned to the loan representative by facsimile or other acceptable delivery method within 24 hours from the time that the interest rate is locked.

| | | |
|---|---|---|
| Johnnie M. Cave | Date | Date |
| _____ | Date | Date |
| _____ | Date | Date |
| MORTGAGE BANKER  Theresa Blaskovich | Date | |

Form 10078L1 Rev 07/03

# EXHIBIT B

# EXHIBIT B - GAINES

Loan Number: 2120672

Please complete the following form and return it to:

**Home Loan Center, Inc., dba LendingTree Loans**
163 Technology Drive
Irvine, CA 92618

### Affiliated Business Arrangement Disclosure Statement

| Borrower Name: | Carl Gaines, Joanne Gaines |
|---|---|
| Mailing Address: | 3521 Grace Avenue<br>Bronx, NY 10466 |
| Subject Property:<br>(property securing loan if different than Mailing Address) | 3521 Grace Avenue<br>Bronx, New York 10466 |
| Re: | Affiliated Business Arrangement Disclosure Statement |

This is to give you notice that **Home Loan Center, Inc., dba LendingTree Loans** ("LTL"), has a business relationship with LTSS, Inc. Both LTL and LTSS are 100% wholly-owned subsidiaries of LendingTree, LLC. Because of this relationship, this referral may provide LTL with a financial or other benefit.

LTSS typically charges the following fees for the services shown below:

| Type of Settlement Service Provided | Estimated Charge or Range of Charges |
|---|---|
| Appraisal Services | $200 - $1000 (charges based on property type and services provided) |
| Title Reports | $ 100 to $250 |
| Title Insurance | $ 300 to $5000 (charges based on loan amount) |
| Flood Certifications | $ 13 |

You are NOT required to use LTSS as a condition for your loan on the subject property as THERE ARE OTHER SETTLEMENT SERVICE PROVIDERS AVAILABLE WITH SIMILAR SERVICES. YOU ARE FREE TO SHOP AROUND TO DETERMINE THAT YOU ARE RECEIVING THE BEST SERVICES AND THE BEST RATE FOR THESE SERVICES.

### Acknowledgment

I/we have read this disclosure form, and understand that LTL is referring me/us to LTSS to obtain the above-described settlement services and may receive financial or other benefit as the result of this referral.

**BORROWER:**
Signature:
Print: Carl Gaines
Date: 12/19/06

**CO-BORROWER:**
Signature:
Print: Joanne Gaines
Date: 12/19/06

**BORROWER:**
Signature: _____
Print: _____

**CO-BORROWER:**
Signature: _____
Print: _____

CONFIDENTIAL
HLC 000286

# EXHIBIT B - CAVE

**Loan Number: 2119107**

Please complete the following form and return it to:

LendingTree Loans
163 Technology Drive
Irvine, CA 92618

### Affiliated Business Arrangement Disclosure Statement

| Borrower Name: | Johnnie Cave |
|---|---|
| Mailing Address: | 5042 Pennbrook Drive<br>Chesterfield, VA  23832 |
| Subject Property: (property securing loan if different than Mailing Address) | 5042 Pennbrook Drive<br>Chesterfield, Virginia  23832 |
| Re: | Affiliated Business Arrangement Disclosure Statement |

This is to give you notice that LendingTree Loans ("LTL"), has a business relationship with LTSS, Inc. Both LTL and LTSS are 100% wholly-owned subsidiaries of LendingTree, LLC.  Because of this relationship, this referral may provide LTL with a financial or other benefit.

LTSS typically charges the following fees for the services shown below:

| Type of Settlement Service Provided | Estimated Charge or Range of Charges |
|---|---|
| Appraisal Services | $200 - $1000 (charges based on property type and services provided) |
| Title Reports | $ 100 to $250 |
| Title Insurance | $ 300 to $5000 (charges based on loan amount) |
| Flood Certifications | $ 13 |

You are NOT required to use LTSS as a condition for your loan on the subject property as THERE ARE OTHER SETTLEMENT SERVICE PROVIDERS AVAILABLE WITH SIMILAR SERVICES.  YOU ARE FREE TO SHOP AROUND TO DETERMINE THAT YOU ARE RECEIVING THE BEST SERVICES AND THE BEST RATE FOR THESE SERVICES.

### Acknowledgment

I/we have read this disclosure form, and understand that LTL is referring me/us to LTSS to obtain the above-described settlement services and may receive financial or other benefit as the result of this referral.

**BORROWER:**                                    **CO-BORROWER:**

Signature: _____      Signature: _____
Print:        _____      Print:        _____
Date:        _____      Date:        _____


**BORROWER:**                                    **CO-BORROWER:**

Signature: _____      Signature: _____

CONFIDENTIAL
HLC 000187

# EXHIBIT C

# EXHIBIT C - GAINES

## GOOD FAITH ESTIMATE OF SETTLEMENT CHARGES

| Borrower Name(s) and Property Address: | Lender's Name, Address and Phone Number: |
|---|---|
| Carl Gaines, Joanne Gaines | Home Loan Center, Inc., dba LendingTree Loans |
| | 163 Technology Drive |
| 3521 Grace Avenue | Irvine, CA 92618 |
| Bronx, New York 10466 | (800) 942-3683 |
| | Loan Officer: Theresa Blaskovich |

| Loan Number: 2120672 | Date of this Estimate: 10/31/2006 | Estimated Closing Date: | Loan Program: Jumbo 1 Month MTA ARM |
|---|---|---|---|
| Loan Amount: 219,000.00 | Value: 450,000.00 | Sales Price: | Loan to Value 73.7899 % | Note Rate 1.7000 % | Term: 360 mos |

**800 ITEMS PAYABLE IN CONNECTION WITH LOAN**

| Description | Borrower |
|---|---|
| 801 Loan Origination Fee | |
| 802 Loan Discount | $ 3,887.50 |
| 803 Appraisal Fee PAID HLC Appraisal [$400 POC by L] | |
| 804 Credit Report Fee CREDCO-Instant Merge 2000 [$7 POC by L] | |
| 815 TruCost Lender | $ 5,300.00 |
| 816 Flood Certification; LTSS (Lending Tree Settlement Services) [$10 POC] | |
| 833 Credit for MICR Lender [$ ] | |
| 834 Loan Application Fee: Lender | |
| 835 Lender Credit for Prepaid Borrower | $ -400.00 |

**1100 TITLE CHARGES**

| Description | Borrower |
|---|---|
| 1101 Settlement Fee (Escrow): LTSS [$400 POC by L] | |
| 1105 Notary Fees: First American Title [$1 ] [$50 POC by L] | |
| 1108 Title Insurance: LTSS [$650 POC by L] | |
| 1113 Escrow Courier Fee: | $ 15.00 |
| 1114 Escrow Wire Fee: | $ 15.00 |

**900 ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE**

| | | |
|---|---|---|
| 901 Interest From  11/30/06 | | |
| To  12/01/06 @ $ 14.99 /day | | $ 14.99 |
| 903 County/City Tax Installment | | |
| 904 Hazard Insurance Premium | | |
| 905 Flood Insurance Premium | | |

**1200 GOVERNMENT RECORDING AND TRANSFER CHARGES**

| | |
|---|---|
| 1201 Recording Fees: [$75 POC by B] | |
| 1204 Tax – Mortgage: [$ ] | $ 4712.__ |

**1000 RESERVES DEPOSITED WITH LENDER**

| | | |
|---|---|---|
| 1001 Impounds – Hazard Insurance 2 Months @ $ 100.00 Per Month | $ 200.00 | |
| 1004 Impounds – County Property taxes 1 Months @ $ 300.00 Per Month | $ 300.00 | |
| 1006 Impounds – Flood Insurance | $ 0.00 | |
| 1007 Impounds – Aggregate Method Adjustment: Impound cushion = $0.00 | $ -750.00 | |

**1300 ADDITIONAL SETTLEMENT CHARGES**

| | |
|---|---|
| 1307 Settlement Fee: Settlement Company | |

| **1400 TOTAL ESTIMATED SETTLEMENT CHARGES** | $ 13,384.36 |
|---|---|

**EST. MONTHLY PMT.**

| | |
|---|---|
| P&I | 1,131.81 |
| R.E. Taxes | 150.00 |
| Hazard Ins | 100.00 |
| Flood Ins | 0.00 |
| Mtg Ins | 0.00 |
| Other | |
| Total Pmt. | 1,381.81 |

**PPD INT & ESCROWS**

| | |
|---|---|
| Prepaid Interest | |
| Other Items Pd In Adv | 14.99 |
| Deposited Reserves | -250.00 |
| Total Prepaids | -235.14 |

**ANNUAL AMOUNT**

| | |
|---|---|
| R.E. Taxes | 1,800.00 |
| Hazard Ins | 1,200.00 |
| Flood Ins | 0.00 |
| Mtg Ins | 0.00 |
| Other | |

**Analysis Of Estimated Settlement Charges**

| 1400 Total Estimated | | |
|---|---|---|
| Settlement Charges: | $ | 13,384.36 |
| Less: Prepaid Interest | | |
| And Escrows: | $ | -235.14 |
| = Other Estimated | | |
| Settlement Charges: | $ | 13,629.50 |

This section to be completed only if a particular provider of service is required. Listed below are providers of services which we require you use. The charges or ranges indicated in the Good Faith Estimate above are based upon the corresponding charge of the lower designated providers.

| Item No.  902 | Name/Address  Unassigned, –, CA 92618 | | | |
|---|---|---|---|---|
| Telephone (800) 121-3131 | Relationship ? [X] Yes [ ] No | Nature of Relationship | Repeated Use | |
| Item No.  814 | Name/Address  American Title, Inc. (1st TD), 11910 Burdette Street, Omaha, NE, 68164 | | | Mortgage Ins |
| Telephone (800) 691-0686 | Relationship ? [X] Yes [ ] No | Nature of Relationship | Repeated Use | Doc Signing Services |
| Item No.  804 | Name/Address  CREDCO-Instant Merge 2000, 12395 First American Way, Poway, CA, 92064 | | | |
| Telephone (800) 637-2422 | Relationship ? [X] Yes [ ] No | Nature of Relationship | Repeated Use | Credit Bureau |
| Item No. | Name/Address | | | |
| Telephone | Relationship ? [ ] Yes [ ] No | Nature of Relationship | Repeated Use | |
| Item No.  1303 | Name/Address  Lender will require a provider from a controlled list, we have not yet decided which provider will be selected | | | |
| Telephone  See HUD-1 | Relationship ? [X] Yes [ ] No | Nature of Relationship | Repeated Use | Flood DET Provider |
| Item No.  1101 | Name/Address  will require a provider from a controlled list, we have not yet decided which provider will be selected | | | |
| Telephone  See HUD-1 | Relationship ? [X] Yes [ ] No | Nature of Relationship | Repeated Use | |
| Item No.  803 | Name/Address  Lender will require a provider from a controlled list, we have not yet decided which provider will be selected | | | Appraisal |
| Telephone  See HUD-1 | Relationship ? [ ] Yes [ ] No | Nature of Relationship | Repeated Use | |
| Item No.  1108 | Name/Address  Lender will require a provider from a controlled list, we have not yet decided which provider will be selected | | | Title Company |
| Telephone  See HUD-1 | Relationship ? [X] Yes [ ] No | Nature of Relationship | Repeated Use | |

You acknowledge you have received a copy of the HUD Special Information Booklet "Settlement Costs", if your application is to purchase residential real property and the Lender will give it first lien on the property.

If for any reason the loan you have applied for does not close, and if permitted by applicable law, you agree to reimburse the lender for any and all costs incurred to process your application including but not limited to appraisal, survey and title insurance.

These estimates are provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (RESPA). Additional information can be found in the HUD Special Information Booklet, which is to be provided to you by your mortgage broker or lender, if your application is to purchase residential real property and the lender will take a first lien on the property.

| Carl Gaines | Date 11/14/06 | Joanne Gaines | Date |
|---|---|---|---|
| | Date | | Date |
| | | | Date **CONFIDENTIAL** |
| | | | **HLC 000435** |

# EXHIBIT C - CAVE

# GOOD FAITH ESTIMATE OF SETTLEMENT CHARGES

| Borrower Name(s) and Property Address: | Lender's Name, Address and Phone Number: |
|---|---|
| Johnnie Cave | Home Loan Center, Inc., dba LendingTree Loans |
| | 163 Technology Drive |
| 5042 Pennbrook Drive | Irvine, CA  92618 |
| Chesterfield, Virginia  23832 | (800) 942-3683 |
| | Loan Officer:  Theresa Blaskovich |

| Loan Number: 2119092 | Date of this Estimate: 9/26/2006 | Estimated Closing Date: 10/26/2006 | Loan Program  Jumbo 1 Month MTA ARM w/pre |
|---|---|---|---|
| Loan Amount: 192,000.00 | Value: 240,000.00 | Sales Price: | Loan to Value  80.0000 % | Note Rate: 2.0000 % | Term: 480 mos |

The information provided below reflects estimates of the charges which you are likely to incur at the settlement of your loan. The fees listed are estimates - the actual charges may be more or less. Your transaction may not involve a fee for every item listed. The numbers listed beside the estimates generally correspond to the numbered lines contained in the HUD-1 or HUD-1A settlement statement that you will receive at settlement. The HUD-1 or HUD-1A settlement statement will show you the actual cost for items paid at settlement.

| 800 | ITEMS PAYABLE IN CONNECTION WITH LOAN: | Borrower |
|---|---|---|
| | Description | |
| 801 | Loan Origination Fee: | $ |
| 802 | Loan Discount: | $ |
| 803 | Appraisal Fee: HLC Appraisal [$400 POC by L] | $ 3,840.00 |
| 804 | Credit Report Fee CREDCO-Instant Merge 2000 [$7 POC by L] | $ |
| 808 | Lock Deposit Lender [$400 POC by B] | $ |
| 815 | TrueCost Lender | $ 2,500.00 |
| 816 | Flood Certification: LTSS (Lending Tree Settlement Services) [$10 POC] | $ |
| 833 | Credit for NrCC | $ |
| 834 | Lender Credit for Prepaids Borrower | $ |

| 1100 | TITLE CHARGES: | |
|---|---|---|
| 1101 | Settlement Fee (HLC Escrow) HLC Escrow [$450 POC by L] | $ |
| 1106 | Notary Fee: Nationwide Document Service [$90 POC by L] | $ |
| 1108 | Title Insurance (LTSS) LTSS [$850 POC by L] | $ |
| 1113 | Escrow Courier Fee: | $  15.00 |
| 1114 | Escrow Wire Fee: | $  15.00 |

| 1200 | GOVERNMENT RECORDING AND TRANSFER CHARGES: | |
|---|---|---|
| 1201 | Recording Fees: [$75 POC by B] | $ |
| 1204 | Tax - Mortgage: | $ 480 |
| 1205 | Tax - Transfer: | $ TBD |

| 900 | ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE: | |
|---|---|---|
| 901 | Interest From  10/26/06 | |
| | To  11/01/06 at $  10.52  /day | 63.12 |
| 903 | County/City Tax Installment | $ |
| 904 | Hazard Insurance Premium | $ |
| 905 | Flood Insurance Premium | $ |

| 1300 | ADDITIONAL SETTLEMENT CHARGES: | |
|---|---|---|
| 1307 | Settlement Pad Settlement Company | $ |

| 1000 | RESERVES DEPOSITED WITH LENDER: | |
|---|---|---|
| 1001 | Impounds - Hazard Insurance: 2 Months at $100.00  Per Month | $  200.00 |
| 1004 | Impounds - County Property taxes: 2 Months at $150.00  Per Month | $  300.00 |
| 1006 | Impounds - Flood Insurance: | $ |
| 1007 | Impounds - Aggregate Method Adjustment: Impound cushion = $0.00 | $  -250.00 |

| 1400 | TOTAL ESTIMATED SETTLEMENT CHARGES | $ 7,163.12 |
|---|---|---|

| EST MONTHLY PMT: | | PPD INT & ESCROWS: | | ANNUAL AMOUNT: | | Analysis Of Estimated Settlement Charges |
|---|---|---|---|---|---|---|
| P&I | 581.43 | Prepaid Interest | | | | 1400 Total Estimated |
| RE Taxes | 150.00 | Other Items Pd in Adv | 63.12 | RE Taxes | 1,800.00 | Settlement Charges.    $  7,163.12 |
| Hazard Ins | 100.00 | Deposited Reserves | | Hazard Ins | 1,200.00 | |
| Flood Ins | 0.00 | | 250.00 | Flood Ins | | Less: Prepaid Interest |
| Mtg Ins | 0.00 | | | Mtg Ins | 0.00 | And Escrows:    $  313.12 |
| Other | 165.00 | | | Other | | |
| Total Pmt. | 996.43 | Total Prepaids | 313.12 | | | = Other Estimated |
| | | | | | | Settlement Charges:    $  6,850.00 |

This section to be completed only if a particular provider of service is required. Listed below are providers of service which we require you use. The charges or ranges indicated in the Good Faith Estimate above are based upon the corresponding charge of the below designated providers.

| Item No. 902 | Name/Address  Unassigned, , , CA, 92618 | | | | |
|---|---|---|---|---|---|
| | Telephone  (555) 121-2121 | Relationship ?  [X] Yes  [ ] No | Nature of Relationship: | Repeated Use | Mortgage Ins |
| Item No. 804 | Name/Address  CREDCO-Instant Merge 2000, 12395 First American Way, Poway, CA, 92064 | | | | |
| | Telephone  (800) 637-2422 | Relationship ?  [X] Yes  [ ] No | Nature of Relationship: | Repeated Use | Credit Bureau |
| Item No. 814 | Name/Address  Nationwide Document Service, 375 East Elliot Road, Chandler, AZ, 85225 | | | | |
| | Telephone  (888) 520-4601 | Relationship ?  [X] Yes  [ ] No | Nature of Relationship: | Repeated Use | Doc Signing Services |
| Item No. | Name/Address | | | | |
| | Telephone | Relationship ?  [X] Yes  [ ] No | Nature of Relationship: | Repeated Use | |
| Item No. 1303 | Name/Address  Lender will require a provider from a controlled list, we have not yet decided which provider will be selected | | | | |
| | Telephone  See HUD-1 | Relationship ?  [X] Yes  [ ] No | Nature of Relationship: | Repeated Use | Flood Cert Provider |
| Item No. 1101 | Name/Address  Lender will require a provider from a controlled list, we have not yet decided which provider will be selected | | | | |
| | Telephone  See HUD-1 | Relationship ?  [X] Yes  [ ] No | Nature of Relationship: | Repeated Use | Title Company |
| Item No. 803 | Name/Address  Lender will require a provider from a controlled list, we have not yet decided which provider will be selected | | | | |
| | Telephone  See HUD-1 | Relationship ?  [X] Yes  [ ] No | Nature of Relationship: | Repeated Use | Settlement/Escrow |
| Item No. 1109 | Name/Address  Lender will require a provider from a controlled list, we have not yet decided which provider will be selected | | | | |
| | Telephone  See HUD-1 | Relationship ?  [X] Yes  [ ] No | Nature of Relationship: | Repeated Use | Appraisal |

**AGREEMENT:**

You acknowledge you have received a copy of the HUD Special Information Booklet "Settlement Costs", if your application is to purchase residential real property and the Lender will take a first lien on the property if for any reason in the loan you have applied for does not close, and if permitted by applicable law, you agree to reimburse the lender for any and all costs incurred to process your application related to appraisal, survey and title insurance.

These estimates are provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (RESPA). Additional information can be found in the HUD Special Information Booklet, which is to be provided to you by your mortgage broker or lender, if your application is to purchase residential real property and the lender will take a first lien on the property.

***In different terms, TrueCost™ does not include loan origination points, discount points, prepaid interest, county recording fees, insurance broker fee, HOA certification fees, and impounds for real estate taxes and insurance. TrueCost™ also does not include any fees or title charges demanded by your prior lender for subordination or payoff of your prior loan including reconveyance fees or any charge related to the preparation or delivery of the payoff demand statement. Some states, counties and municipalities require the payment of a mortgage tax at the closing of your loan. TrueCost™ does not include any applicable mortgage/property taxes, intangible taxes, documentary transfer taxes, or a tax of any kind. All escrow fees are included in TrueCost™ except fees for payment of a vesting/transfer deed, and courier fees/wire fees where you request expedited delivery of funds via overnight mail or bank wire. If a 442 final inspection is required for your property, this fee will not be included in TrueCost™. If your loan is a purchase transaction, TrueCost™ also does not include Title Insurance charges, Appraisal Fee, and Escrow charges.

| Johnnie Cave | Date | | Date |
|---|---|---|---|
| | Date | | Date |
| | Date | | |

# EXHIBIT D

*Exhibit D is filed
confidentially under seal*

# EXHIBIT E

# EXHIBIT E - GAINES



## HOME EQUITY LINE OF CREDIT EXPLANATION
## CONSUMER DISCLOSURE

| Loan Number: 2121341 | Date: November 14, 2006 |
|---|---|
| Borrower Name(s) and Property Address:<br><br>Carl Gaines, Joanne Gaines<br><br><br>3521 Grace Avenue<br>Bronx, New York 10466 | Lender's Name, Address and Phone Number:<br><br>Home Loan Center, Inc., dba LendingTree Loans<br>163 Technology Drive<br>Irvine, CA 92618<br><br>8009423683 |

More and more lenders are offering home equity lines of credit. By using the **equity** in your home, you may qualify for a sizable amount of credit, available for use when and how you please, at an **interest rate** that is relatively low. Furthermore, under the tax law--depending on your specific situation--you may be allowed to deduct the interest because the debt is secured by your home.

If you are in the market for credit, a home equity plan may be right for you. Or perhaps another form of credit would be better. Before making a decision, you should weigh carefully the costs of a home equity line against the benefits. Shop for the credit terms that best meet your borrowing needs without posing undue financial risk. And remember, failure to repay the amounts you've borrowed, plus interest, could mean the loss of your home.

### What is a home equity line of credit?

A home equity line of credit is a form of revolving credit in which your home serves as collateral. Because the home is likely to be a consumer's largest asset, many homeowners use their credit lines only for major items such as education, home improvements, or medical bills and not for day-to-day expenses.

With a home equity line, you will be approved for a specific amount of credit--your **credit limit**, the maximum amount you may borrow at any one time under the plan. Many lenders set the credit limit on a home equity line by taking a percentage (say, 75 percent) of the home's appraised value and subtracting from that the balance owed on the existing mortgage. For example,

| | |
|---|---|
| Appraised value of home | $100,000 |
| Percentage | X 75% |
| Percentage of appraised value | = $ 75,000 |
| Less balaced owed on mortgage | - $ 40,000 |
| Potential credit | $ 35,000 |

In determining your actual credit limit, the lender will also consider your ability to repay, by looking at your income, debts, and other financial obligations as well as your credit history.

Many home equity plans set a fixed period during which you can borrow money, such as 10 years. At the end of this "draw period," you may be allowed to renew the credit line. If your plan does not allow renewals, you will not be able to borrow additional money once the period has ended. Some plans may call for payment in full of any outstanding balance at the end of the period. Others may allow repayment over a fixed period (the "repayment period"), for example, 10 years.

Once approved for a home equity line of credit, you will most likely be able to borrow up to your credit limit whenever you want. Typically, you will use special checks to draw on your line. Under some plans, borrowers can use a credit card or other means to draw on the line.

CONFIDENTIAL
HLC 000778



There may be limitations on how you use the line. Some plans may require you to borrow a minimum amount each time you draw on the line (for example, $300) and to keep a minimum amount outstanding. Some plans may also require that you take an initial advance when the line is set up.

### What should you look for when shopping for a plan?

If you decide to apply for a home equity line of credit, look for the plan that best meets your particular needs. Read the credit agreement carefully, and examine the terms and conditions of various plans, including the annual percentage rate (APR) and the costs of establishing the plan. The APR for a home equity line is based on the interest rate alone and will not reflect the closing costs and other fees and charges, so you'll need to compare these costs, as well as the APRs, among lenders.

### Interest rate charges and related plan features

Home equity lines of credit typically involve variable rather than fixed interest rates. The variable rate must be based on a publicly available index (such as the prime rate published in some major daily newspapers or a U.S. Treasury bill rate); the interest rate for borrowing under the home equity line changes, mirroring fluctuations in the value of the index. Most lenders cite the interest rate you will pay as the value of the index at a particular time plus a "margin," such as 2 percentage points. Because the cost of borrowing is tied directly to the value of the index, it is important to find out which index is used, how often the value of the index changes, and how high it has risen in the past as well as the amount of the margin.

Lenders sometimes offer a temporarily discounted interest rate for home equity lines—a rate that is unusually low and may last for only an introductory period, such as 6 months.

Variable-rate plans secured by a dwelling must, by law, have a ceiling (or cap) on how much your interest rate may increase over the life of the plan. Some variable-rate plans limit how much your payment may increase and how low your interest rate may fall if interest rates drop.

Some lenders allow you to convert from a variable interest rate to a fixed rate during the life of the plan, or to convert all or a portion of your line to a fixed-term installment loan.

Plans generally permit the lender to freeze or reduce your credit line under certain circumstances. For example, some variable-rate plans may not allow you to draw additional funds during a period in which the interest rate reaches the cap.

### Costs of establishing and maintaining a home equity line

Many of the costs of setting up a home equity line of credit are similar to those you pay when you buy a home. For example,

- A fee for a property appraisal to estimate the value of your home
- An **application fee**, which may not be refunded if you are turned down for credit
- Up-front charges, such as one or more points (one point equals 1 percent of the credit limit)
- Closing costs, including fees for attorneys, title search, and mortgage preparation and filing; property and title insurance; and taxes.

In addition, you may be subject to certain fees during the plan period, such as **annual membership or maintenance fees** and a **transaction fee** every time you draw on the credit line.

CONFIDENTIAL
HLC 000779



You could find yourself paying hundreds of dollars to establish the plan. If you were to draw only a small amount against your credit line, those initial charges would substantially increase the cost of the funds borrowed. On the other hand, because the lender's risk is lower than for other forms of credit, as your home serves as collateral, annual percentage rates for home equity lines are generally lower than rates for other types of credit. The interest you save could offset the costs of establishing and maintaining the line. Moreover, some lenders waive some or all of the closing costs.

## How will you repay your home equity plan?

Before entering into a plan, consider how you will pay back the money you borrow. Some plans set **minimum payments** that cover a portion of the principal (the amount you borrow) plus accrued interest. But (unlike with the typical installment loan) the portion that goes toward principal may not be enough to repay the principal by the end of the term. Other plans may allow payment of interest alone during the life of the plan, which means that you pay nothing toward the principal. If you borrow $10,000, you will owe that amount when the plan ends.

Regardless of the minimum required payment, you may choose to pay more, and many lenders offer a choice of payment options. Many consumers choose to pay down the principal regularly as they do with other loans. For example, if you use your line to buy a boat, you may want to pay it off as you would a typical boat loan.

Whatever your payment arrangements during the life of the plan--whether you pay some, a little, or none of the principal amount of the loan--when the plan ends you may have to pay the entire balance owed, all at once. You must be prepared to make this "balloon payment" by refinancing it with the lender, by obtaining a loan from another lender, or by some other means. If you are unable to make the balloon payment, you could lose your home.

If your plan has a variable interest rate, your monthly payments may change. Assume, for example, that you borrow $10,000 under a plan that calls for interest-only payments. At a 10 percent interest rate, your monthly payments would be $83. If the rate rises over time to 15 percent, your monthly payments will increase to $125. Similarly, if you are making payments that cover interest plus some portion of the principal, your monthly payments may increase, unless your agreement calls for keeping payments the same throughout the plan period.

If you sell your home, you will probably be required to pay off your home equity line in full immediately. If you are likely to sell your home in the near future, consider whether it makes sense to pay the up-front costs of setting up a line of credit. Also keep in mind that renting your home may be prohibited under the terms of your agreement.

## Lines of credit vs. traditional second mortgage loans

If you are thinking about a home equity line of credit, you might also want to consider a traditional second mortgage loan. A second mortgage provides you with a fixed amount of money repayable over a fixed period. In most cases the payment schedule calls for equal payments that will pay off the entire loan within the loan period. You might consider a second mortgage instead of a home equity line if, for example, you need a set amount for a specific purpose, such as an addition to your home.

In deciding which type of loan best suits your needs, consider the costs under the two alternatives. Look at both the APR and other charges. Do not, however, simply compare the APRs, because the APRs on the two types of loans are figured differently:

- The APR for a traditional second mortgage loan takes into account the interest rate charged plus points and other finance charges.
- The APR for a home equity line of credit is based on the periodic interest rate alone. It does not include points or other charges.

CONFIDENTIAL
HLC 000780



### Disclosures from Lenders

The federal Truth in Lending Act requires lenders to disclose the important terms and costs of their home equity plans, including the APR, miscellaneous charges, the payment terms, and information about any variable-rate feature. And in general, neither the lender nor anyone else may charge a fee until after you have received this information. You usually get these disclosures when you receive an application form, and you will get additional disclosures before the plan is opened. If any term (other than a variable-rate feature) changes before the plan is opened, the lender must return all fees if you decide not to enter into the plan because of the change.

When you open a home equity line, the transaction puts your home at risk. If the home involved is your principal dwelling, the Truth in Lending Act gives you 3 days from the day the account was opened to cancel the credit line. This right allows you to change your mind for any reason. You simply inform the lender in writing within the 3-day period. The lender must then cancel its **security interest** in your home and return all fees—including any application and appraisal fees—paid to open the account.

### Glossary

**Annual membership or maintenance fee**  - An annual charge for having the line of credit available. Charged regardless of whether or not the line is used.

**Annual percentage rate (APR)**  - The cost of credit on a yearly basis expressed as a percentage.

**Application fee** - Fees that are paid upon application. May include charges for property appraisal and a credit report.

**Balloon payment** -  A lump-sum payment that may be required when the plan ends.

**Cap** - A limit on how much the variable interest rate may increase during the life of the plan.

**Closing costs** - Fees paid at closing, including attorneys fees, fees for preparing and filing a mortgage, fees for title search, taxes, and insurance.

**Credit limit** -The maximum amount that may be borrowed under the home equity plan.

**Equity** - The difference between the fair market value (appraised value) of the home and the outstanding mortgage balance.

**Index** - Published rate that serves as a base for the interest rate charged on a home equity line and also as the base for rate changes used by the lender.

**Interest rate** -The periodic charge, expressed as a percentage, for use of credit.

**Margin** - The number of percentage points the lender adds to the index rate to determine the annual percentage rate.

**Minimum payment** -The minimum amount that you must pay (usually monthly) on your account. Under some plans, the minimum payment may cover interest only; under others, it may include both principal and interest.

**Points**  - One point is equal to 1 percent of the amount of the credit line. Points must usually be paid at closing and are in addition to monthly interest.

**Security interest** - An interest that a lender takes in the borrower's property to ensure repayment of a debt.

Page 4 of 5

CONFIDENTIAL
HLC 000781

**Transaction fee** - A fee charged each time you draw on your credit line.

**Variable rate** - An interest rate that changes periodically in relation to an index. Payments may increase or decrease accordingly.

*I acknowledge, by signing below, that I have read and received a copy of this notice.*

| | |
|---|---|
| Carl Gaines | Joanne Gaines |
| Date | Date |
| Date | Date |
| Date | Date |

CONFIDENTIAL
HLC 000782

# EXHIBIT E - CAVE

**REDACTED**

**HOME EQUITY LINE OF CREDIT EXPLANATION**
**CONSUMER DISCLOSURE**

| Loan Number: | Date: September 26, 2006 |
|---|---|
| Borrower Name(s) and Property Address:<br><br>Johnnie Cave<br><br><br>**5042 Pennbrook Drive**<br>**Chesterfield, Virginia 23832** | Lender's Name, Address and Phone Number:<br><br>**Home Loan Center, Inc., dba LendingTree Loans**<br>**163 Technology Drive**<br>**Irvine, CA 92618**<br><br>**8009423683** |

More and more lenders are offering home equity lines of credit. By using the **equity** in your home, you may qualify for a sizable amount of credit, available for use when and how you please, at an **interest rate** that is relatively low. Furthermore, under the tax law--depending on your specific situation--you may be allowed to deduct the interest because the debt is secured by your home.

If you are in the market for credit, a home equity plan may be right for you. Or perhaps another form of credit would be better. Before making a decision, you should weigh carefully the costs of a home equity line against the benefits. Shop for the credit terms that best meet your borrowing needs without posing undue financial risk. And remember, failure to repay the amounts you've borrowed, plus interest, could mean the loss of your home.

**What is a home equity line of credit?**

A home equity line of credit is a form of revolving credit in which your home serves as collateral. Because the home is likely to be a consumer's largest asset, many homeowners use their credit lines only for major items such as education, home improvements, or medical bills and not for day-to-day expenses.

With a home equity line, you will be approved for a specific amount of credit--your **credit limit**, the maximum amount you may borrow at any one time under the plan. Many lenders set the credit limit on a home equity line by taking a percentage (say, 75 percent) of the home's appraised value and subtracting from that the balance owed on the existing mortgage. For example,

| | |
|---|---|
| Appraised value of home | $100,000 |
| Percentage | X 75% |
| Percentage ofappraised value | = $ 75,000 |
| Less balaced owed on mortgage | - $ 40,000 |
| Potential credit | $ 35,000 |

In determining your actual credit limit, the lender will also consider your ability to repay, by looking at your income, debts, and other financial obligations as well as your credit history.

Many home equity plans set a fixed period during which you can borrow money, such as 10 years. At the end of this "draw period," you may be allowed to renew the credit line. If your plan does not allow renewals, you will not be able to borrow additional money once the period has ended. Some plans may call for payment in full of any outstanding balance at the end of the period. Others may allow repayment over a fixed period (the "repayment period"), for example, 10 years.

Once approved for a home equity line of credit, you will most likely be able to borrow up to your credit limit whenever you want. Typically, you will use special checks to draw on your line. Under some plans, borrowers can use a credit card or other means to draw on the line.

**CONFIDENTIAL**
**HLC 000199**



There may be limitations on how you use the line. Some plans may require you to borrow a minimum amount each time you draw on the line (for example, $300) and to keep a minimum amount outstanding. Some plans may also require that you take an initial advance when the line is set up.

### What should you look for when shopping for a plan?

If you decide to apply for a home equity line of credit, look for the plan that best meets your particular needs. Read the credit agreement carefully, and examine the terms and conditions of various plans, including the annual percentage rate (APR) and the costs of establishing the plan. The APR for a home equity line is based on the interest rate alone and will not reflect the closing costs and other fees and charges, so you'll need to compare these costs, as well as the APRs, among lenders.

### Interest rate charges and related plan features

Home equity lines of credit typically involve variable rather than fixed interest rates. The variable rate must be based on a publicly available index (such as the prime rate published in some major daily newspapers or a U.S. Treasury bill rate); the interest rate for borrowing under the home equity line changes, mirroring fluctuations in the value of the index. Most lenders cite the interest rate you will pay as the value of the index at a particular time plus a "margin," such as 2 percentage points. Because the cost of borrowing is tied directly to the value of the index, it is important to find out which index is used, how often the value of the index changes, and how high it has risen in the past as well as the amount of the margin.

Lenders sometimes offer a temporarily discounted interest rate for home equity lines--a rate that is unusually low and may last for only an introductory period, such as 6 months.

Variable-rate plans secured by a dwelling must, by law, have a ceiling (or cap) on how much your interest rate may increase over the life of the plan. Some variable-rate plans limit how much your payment may increase and how low your interest rate may fall if interest rates drop.

Some lenders allow you to convert from a variable interest rate to a fixed rate during the life of the plan, or to convert all or a portion of your line to a fixed-term installment loan.

Plans generally permit the lender to freeze or reduce your credit line under certain circumstances. For example, some variable-rate plans may not allow you to draw additional funds during a period in which the interest rate reaches the cap.

### Costs of establishing and maintaining a home equity line

Many of the costs of setting up a home equity line of credit are similar to those you pay when you buy a home. For example,

- A fee for a property appraisal to estimate the value of your home
- An **application fee**, which may not be refunded if you are turned down for credit
- Up-front charges, such as one or more points (one point equals 1 percent of the credit limit)
- Closing costs, including fees for attorneys, title search, and mortgage preparation and filing; property and title insurance; and taxes.

In addition, you may be subject to certain fees during the plan period, such as **annual membership or maintenance fees** and a **transaction fee** every time you draw on the credit line.

**CONFIDENTIAL**
**HLC 000200**



You could find yourself paying hundreds of dollars to establish the plan. If you were to draw only a small amount against your credit line, those initial charges would substantially increase the cost of the funds borrowed. On the other hand, because the lender's risk is lower than for other forms of credit, as your home serves as collateral, annual percentage rates for home equity lines are generally lower than rates for other types of credit. The interest you save could offset the costs of establishing and maintaining the line. Moreover, some lenders waive some or all of the closing costs.

## How will you repay your home equity plan?

Before entering into a plan, consider how you will pay back the money you borrow. Some plans set **minimum payments** that cover a portion of the principal (the amount you borrow) plus accrued interest. But (unlike with the typical installment loan) the portion that goes toward principal may not be enough to repay the principal by the end of the term. Other plans may allow payment of interest alone during the life of the plan, which means that you pay nothing toward the principal. If you borrow $10,000, you will owe that amount when the plan ends.

Regardless of the minimum required payment, you may choose to pay more, and many lenders offer a choice of payment options. Many consumers choose to pay down the principal regularly as they do with other loans. For example, if you use your line to buy a boat, you may want to pay it off as you would a typical boat loan.

Whatever your payment arrangements during the life of the plan--whether you pay some, a little, or none of the principal amount of the loan--when the plan ends you may have to pay the entire balance owed, all at once. You must be prepared to make this "balloon payment" by refinancing it with the lender, by obtaining a loan from another lender, or by some other means. If you are unable to make the balloon payment, you could lose your home.

If your plan has a variable interest rate, your monthly payments may change. Assume, for example, that you borrow $10,000 under a plan that calls for interest-only payments. At a 10 percent interest rate, your monthly payments would be $83. If the rate rises over time to 15 percent, your monthly payments will increase to $125. Similarly, if you are making payments that cover interest plus some portion of the principal, your monthly payments may increase, unless your agreement calls for keeping payments the same throughout the plan period.

If you sell your home, you will probably be required to pay off your home equity line in full immediately. If you are likely to sell your home in the near future, consider whether it makes sense to pay the up-front costs of setting up a line of credit. Also keep in mind that renting your home may be prohibited under the terms of your agreement.

## Lines of credit vs. traditional second mortgage loans

If you are thinking about a home equity line of credit, you might also want to consider a traditional second mortgage loan. A second mortgage provides you with a fixed amount of money repayable over a fixed period. In most cases the payment schedule calls for equal payments that will pay off the entire loan within the loan period. You might consider a second mortgage instead of a home equity line if, for example, you need a set amount for a specific purpose, such as an addition to your home.

In deciding which type of loan best suits your needs, consider the costs under the two alternatives. Look at both the APR and other charges. Do not, however, simply compare the APRs, because the APRs on the two types of loans are figured differently:

- The APR for a traditional second mortgage loan takes into account the interest rate charged plus points and other finance charges.
- The APR for a home equity line of credit is based on the periodic interest rate alone. It does not include points or other charges.

CONFIDENTIAL
HLC 000201

**Disclosures from Lenders**

The federal Truth in Lending Act requires lenders to disclose the important terms and costs of their home equity plans, including the APR, miscellaneous charges, the payment terms, and information about any variable-rate feature. And in general, neither the lender nor anyone else may charge a fee until after you have received this information. You usually get these disclosures when you receive an application form, and you will get additional disclosures before the plan is opened. If any term (other than a variable-rate feature) changes before the plan is opened, the lender must return all fees if you decide not to enter into the plan because of the change.

When you open a home equity line, the transaction puts your home at risk. If the home involved is your principal dwelling, the Truth in Lending Act gives you 3 days from the day the account was opened to cancel the credit line. This right allows you to change your mind for any reason. You simply inform the lender in writing within the 3-day period. The lender must then cancel its **security interest** in your home and return all fees—including any application and appraisal fees—paid to open the account.

## Glossary

**Annual membership or maintenance fee** - An annual charge for having the line of credit available. Charged regardless of whether or not the line is used.

**Annual percentage rate (APR)** - The cost of credit on a yearly basis expressed as a percentage.

**Application fee** - Fees that are paid upon application. May include charges for property appraisal and a credit report.

**Balloon payment** - A lump-sum payment that may be required when the plan ends.

**Cap** - A limit on how much the variable interest rate may increase during the life of the plan.

**Closing costs** - Fees paid at closing, including attorneys fees, fees for preparing and filing a mortgage, fees for title search, taxes, and insurance.

**Credit limit** - The maximum amount that may be borrowed under the home equity plan.

**Equity** - The difference between the fair market value (appraised value) of the home and the outstanding mortgage balance.

**Index** - Published rate that serves as a base for the interest rate charged on a home equity line and also as the base for rate changes used by the lender.

**Interest rate** - The periodic charge, expressed as a percentage, for use of credit.

**Margin** - The number of percentage points the lender adds to the index rate to determine the annual percentage rate.

**Minimum payment** - The minimum amount that you must pay (usually monthly) on your account. Under some plans, the minimum payment may cover interest only; under others, it may include both principal and interest.

**Points** - One point is equal to 1 percent of the amount of the credit line. Points must usually be paid at closing and are in addition to monthly interest.

**Security interest** - An interest that a lender takes in the borrower's property to ensure repayment of a debt.

CONFIDENTIAL
HLC 000202

**Transaction fee** - A fee charged each time you draw on your credit line.

**Variable rate** - An interest rate that changes periodically in relation to an index. Payments may increase or decrease accordingly.

*I acknowledge, by signing below, that I have read and received a copy of this notice.*

| | |
|---|---|
| Johnnie Cave | |
| _____ Date | _____ Date |
| _____ Date | _____ Date |
| _____ Date | _____ Date |

CONFIDENTIAL
HLC 000203

# EXHIBIT F

HomeLoanCenter.com
163 Technology Drive
Irvine, CA 92618

January 3, 2006

Your property at
**123 Any Street**

| Has been pre-approved | | |
|---|---|---|
| | Loan Amount | NEW Payment |
| SmartLoan Program | $100,000 | $345.12 |
| **1.5%/5.646%**^APR^ | $200,000 | $690.24 |
| | $300,000 | $1,035.36 |
| | $400,000 | $1,380.48 |
| | $500,000 | $1,725.60 |
| Reference No: LT415 | $600,000 | $2,070.72 |

Sample A. Sample
123 Any Street
Anytown, US 12345-6789
|||||||||||||||||||||||||||||||||||||||||||

**Call Now 1-888-952-3683**

or apply online www.homeloancenter.com/smart

Dear Sample,

Are you shopping for a new mortgage? Or getting ready to buy a new home? If so, you've been pre-approved to receive HomeLoanCenter.com's exclusive SmartLoan program. With this offer, you can lower your interest rate and reduce your monthly payment with the option to get extra cash to pay off your debt, make home improvements, or take a vacation. Please use the payment schedule above to see how low your new payment could be.

**Who is HomeLoanCenter.com and how can we offer such a low rate?** As one of the largest direct lenders in the nation, we close billions of dollars in loans every year which allows us to offer the best loan programs with the lowest interest rates to selected homeowners. HomeLoanCenter.com is part of the InterActiveCorp family, a multi-billion dollar publicly traded company (NASDAQ: IACI) that owns many nationally recognized brands such as **Ticketmaster, Expedia, Home Shopping Network, and Hotels.com.** Our large size allows us to deliver great rates and service, and gives you the comfort of knowing that you're working with a solid, reputable lender.

**Are there any hidden fees?** There are no fees or obligation to get started on your loan. Just give us a call and start saving immediately.

**Do I need perfect credit?** No. Whether you're self-employed, have credit problems, or have difficulty proving your income, we can help. A 5-minute phone call is all it takes to see how much you can save. Call us today for a free customized savings evaluation.

**Start saving now with our 1.5% SmartLoan Program.** Call us toll free today at 1-888-952-3683 or apply online at www.homeloancenter.com/smart and speak with one of our Mortgage Experts. We can pre-qualify you right over the phone in minutes and provide you with a customized loan program that suits your needs. Your confidential call is not a commitment, and this could be the call that changes your life.

Sincerely,

*Andrew Simon*

Andrew Simon
Payment Reduction Department

P.S. Call us today at 1-888-952-3683 and we'll take $300 off your appraisal fee†, this offer expires 02/16/2006.

---

You can choose to stop receiving "prescreened" offers of credit from this and other companies by calling toll-free 1-888-5OPTOUT (1-888-567-8688). See PRESCREEN & OPT-OUT NOTICE on other side for more information about prescreened offers.

c/o S. Gorrell, LoanExpedition
163 Technology Drive
Irvine, CA 92618

1-866-212-2921

Reference No: ☐☐☐☐☐

**I Would Like To Use My Loan To:**
- ☐ Lower My Payment
- ☐ Make Home Improvements
- ☐ Pay Off Credit Cards & Other Debt
- ☐ Purchase a New Car
- ☐ Buy a New Home
- ☐ Get Extra Cash: $☐☐☐☐☐

**When Can I Call You?**
Phone: ☐☐☐-☐☐☐-☐☐☐☐
Time: ☐☐:☐☐ AM/PM

First Name _____ Last Name _____ Home Phone _____ Work Phone _____

Street Address _____ Social Security No. (Optional) _____ Annual Salary _____

City _____ State _____ Zip Code _____

What type of property do you own?
- ☐ Single Family Residence
- ☐ Condo  ☐ (Multiple Units)
- ☐ Townhome
- ☐ Other

Email Address (Your privacy is important to us. Your email will not be distributed to any third parties.)

Currently we do not service mobile homes

$ _____ Purchase Price   $ _____ What is your home worth?   _____ Year Purchased

$ _____ 1st Mortgage Balance   $ _____ Monthly Payment   _____% Current Interest Rate   $ _____ 2nd Mortgage Balance (if you have one)   $ _____ Monthly Payment   _____% Current Interest Rate

Borrower's Signature _____ Date _____

The undersigned applicant authorizes Home Loan Center, Inc. to obtain all necessary information to complete the approval process. Necessary credit information may include employment history, savings, checking and consumer credit balances, payment history - including mortgage payment records and balances.

▲ PLEASE FAX OR MAIL THIS FORM. SEE INSTRUCTIONS ABOVE. ▲

PRESCREEN & OPT-OUT NOTICE: This "prescreened" offer of credit is based on information in your credit report indicating that you meet certain criteria. This offer is not guaranteed if you do not meet our criteria including providing acceptable property as collateral. If you do not want to receive prescreened offers of credit from this and other companies, call toll-free 1-888-5OPTOUT (1-888-567-8688), or write: Experian Information System, Inc., P.O. Box 919, Allen, TX 75013.

This offer has been extended because credit criteria have been satisfied for the offer. This offer may not be extended if, after responding to this offer, you do not meet the criteria used in the selection process or any other applicable criteria bearing on your creditworthiness. Further, HomeLoanCenter.com will verify income and employment, review credit, and analyze debt and your equity position in the subject property prior to final loan approval. You have a right to prohibit your credit file from being used for similar pre-screened offers by making a written or telephone request to: Experian Information System, Inc., P.O. Box 919, Allen, TX 75013; Trans Union LLC Opt Out, P.O. Box 97328, Jackson, MS 39238; Equifax, Inc., P.O. Box 740123, Atlanta, GA 30374; or by calling, toll-free 1-888-5OPTOUT (1-888-567-8688). This advertisement does not constitute an offer to enter into an interest rate and/or discount point agreement.

* Start rate of 1.5%, a 5.646 APR, a 2.5% margin and on the 30-year $200,000 loan amount at 1.5% and the effective date was 9/20/05. Terms of payment are based on a margin of 2.10% plus the 1-Month MTA Index 2.022% (as of January 1, 2006) APR of 5.646% is based on a 30-year term, $200,000 loan amount at 1.5%, and may change if the index adjusts after the first 30 days. In the illustrative payment chart shown on the front of this letter, the APR's corresponding to the listed payments are as follows: $100,000 loan amount, 6.062% APR; $200,000 loan amount, 5.646% APR; $300,000 loan amount, 5.612% APR; $400,000 loan amount, 5.594% APR; $500,000 loan amount, 5.581% APR; $600,000 loan amount. 5.573% APR. If minimum payment option is selected, deferred interest may accrue. Interest rate quoted assumes a credit score of 620+ with a loan-to-value (LTV) of 80% on a primary residence. The APR and payment will vary based on the specific terms of the loan selected and verification of information and credit. Rates are subject to change without notice.

*$300 appraisal fee discount is good only at the time of application. In order to receive $300 off your appraisal fee, you must mention the offer at the time of application and must complete your application prior to the offer expiration date listed on the front of this letter. Retroactive discounts will not be honored. This offer applies only to refinance transactions and cannot be combined with any other offers or promotions. This offer is non-transferable.

All loans will be secured by a lien against your property. Not all applicants will be approved. Terms and conditions apply, call for details. AZ Mortgage Banker LIC No. 0904930; Licensed by the Dept. of Corp. under the CA RMLA; GA Residential Mortgage Lender LIC No. 17302; IL Residential Mortgage Licensee; MA Mortgage Lender LIC No. ML2206; Licensed by the New Hampshire Banking Department; LIC by the NJ Dept. of Banking and Insurance; Licensed Mortgage Banker - NYS Banking Department; PA Dept. of Banking Licensee; RI Licensed Lender; Licensed by the Virginia State Corporation Commission, Mortgage Lender and Broker License No. MLB-810; 163 Technology Drive, Irvine, CA 92618. Loan programs are offered by Home Loan Center, Inc. dba LendingTree Loans which is also known as Home Loan Center USA, Inc. in AL, FL, ID, MI, MN, OH, OK, VT, & WY; Online Home Loan Center in NH; LT Loans in NV; and Loan Center, Inc. in WA.

**HLC 003635**
**CONFIDENTIAL**

**HomeLoanCenter.com**
A loan for every home.

Call Today For This Great Rate    NO POINTS

## 1.5% / 5.646 APR %

| | |
|---|---|
| NEW PAYMENT: | $289.96 |
| DIRECT TOLL-FREE NUMBER: | 1-877-592-3683 |
| APPLY ONLINE: | www.homeloancenter.com/lowrate |
| REFERENCE NUMBER: | LT407 |

Sample A. Sample
123 Any Street
Anytown, US 12345-6789

## Your Mortgage Payment at 123 Any Street could be REDUCED to $289.96

Dear Sample,                                                                February 13, 2006

Your property located at **123 Any Street** has been pre-selected for one of our payment reduction programs. You may be eligible to reduce your total monthly payment to **$289.96\*** or take cash out for any reason. With our large selection of loan programs, we can help you even if you've had past credit problems, a bankruptcy, difficulty documenting your income, or even if you've been turned down by another lender.

### It's almost impossible not to qualify! And it's Fast and Easy.
### Call Toll-Free Now 1-877-592-3683

In fact, at HomeLoanCenter.com, **4 out of 5 applicants get approved** for one of our loan programs. As the decision maker on your loan, we can approve your loan quickly and make the closing process fast and easy. Borrow up to 100% of the value of your home and take cash out for any purpose. Pay off high interest debt or tax liens, take a vacation, or finance your child's education. It's up to you! And best of all, the interest may be tax deductible[1], so it's the smart way to borrow. Refinance your existing mortgage and reduce your monthly payment with no out of pocket expenses. You can even skip your first monthly payment!\*

### What will my new payment be if I take advantage of this new loan?

| LOAN AMOUNT | PAYMENT | LOAN AMOUNT | PAYMENT |
|---|---|---|---|
| $100,000 | | $400,000 | |
| $200,000 | | $500,000 | |
| $300,000 | | $600,000 | |

**Start saving now with our 1.5% loan program!** Use the above table to see how much your initial monthly payment could be based on the cash you would like to obtain\*. For a more accurate analysis, please give us a call toll-free at 1-877-592-3683 for a FREE payment quote.

### Qualify in 5 minutes. Close in as little as 10 days.

In just 10 days or less, you could have more financial freedom with a lower mortgage payment or extra cash in-hand to spend as you wish. We've helped thousands of clients just like you.

See how much you qualify for by calling us toll-free at **1-877-592-3683** or apply online through our secure application at **www.homeloancenter.com/lowrate**. There's no cost and no obligation. It could be the phone call that changes your life.

### Limited Time Offer - $300 off your appraisal fee\*\*

Apply within 7 days of receipt of this letter, and we'll give you a $300 credit towards the cost of your appraisal when we close your loan. Just provide the reference number above to your HomeLoanCenter.com representative at time of application to qualify. It's our way of saying "Thank you" for letting us earn your business.

Sincerely,

*Andrew Simmon*
Refinance Manager

## Call Toll-Free Now 1-877-592-3683
## or apply at www.homeloancenter.com/lowrate

HLC 003636
CONFIDENTIAL

\* See reverse side for important disclosures.

**If I've had credit issues in the past or have difficulty documenting my income, will I still qualify?** You've accomplished what most people only dream of – you've purchased a home. At HomeLoanCenter.com, we believe that you've earned the right to borrow against it. We offer loan programs for all credit situations that may not require any income documentation.

**Are there any fees to get started?** There are no fees to get started and no obligation. We want to hear about your unique situation and help you with a loan that fits your needs.

**How quickly can I get my new loan?** As a direct lender, we are the decision maker. We're able to give answers quickly and process your loan faster than most other companies. We can fund your loan in as little as 10 days!

**How long does it take to apply?** Five minutes is all it takes, plus, isn't 5 minutes worth saving hundreds of dollars a month or obtaining the cash you need? It's fast, it's easy and you'll speak directly to a decision maker.

---

\* Start rate of 1.5%, a 5.646 APR, a 2.5% margin and on the 30-year $200,000 loan amount at 1.5% and the effective date was 1/1/06. Terms of payment are based on a margin of 2.10% plus the 1-Month MTA Index 2.022% (as of October 31, 2005) APR of 5.646% is based on a 30-year term, $200,000 loan amount at 1.5%, and may change if the index adjusts after the first 30 days. In the illustrative payment chart shown on the front of this letter, the APR's corresponding to the listed payments are as follows: $100,000 loan amount, 6.062% APR; $200,000 loan amount, 5.646% APR; $300,000 loan amount, 5.612% APR; $400,000 loan amount, 5.594% APR; $500,000 loan amount, 5.581% APR; $600,000 loan amount, 5.573% APR. If minimum payment option is selected, deferred interest may accrue. Interest rate quoted assumes a credit score of 620+ with a loan-to-value (LTV) of 80% on a primary residence. The APR and payment will vary based on the specific terms of the loan selected and verification of information and credit. Rates are subject to change without notice.

 Regarding the skip payment: If your loan closed between January 2 and January 31, the first mortgage payment would not be due until March 1, thus allowing one payment to be skipped. Interest continues to accrue on skipped payments. Always make due payments on current mortgage. Please contact us for full details on skipping a payment.

\*\* $300 off your appraisal fee is based on several factors including but not limited to property type, location, and value of property. Discount is good only at time of application. In order to receive the $300 off your appraisal fee, you must mention the offer at time of application and must complete the application within 7 days of receipt of this letter. Retroactive discounts will not be honored. This offer applies only to refinance transactions and cannot be combined with any other offers or promotions. This offer is non-transferable.

All loans will be secured by a lien against your property. Not all applicants will be approved. Terms and conditions apply, call for details. AZ Mortgage Banker LIC No. 0904930; Licensed by the Dept. of Corp. under the CA RMLA; GA Residential Mortgage Lender LIC No. 17302; IL Residential Mortgage Licensee; MA Mortgage Lender LIC No. ML2206; Licensed by the New Hampshire Banking Department; LIC by the NJ Dept. of Banking and Insurance; Licensed Mortgage Banker - NYS Banking Department; PA Dept. of Banking Licensee; RI Licensed Lender; Licensed by the Virginia State Corporation Commission, Mortgage Lender and Broker License No. MLB-810; 163 Technology Drive, Irvine, CA 92618. Loan programs are offered by Home Loan Center, Inc. dba Lending Tree Loans which is also known as Home Loan Center USA, Inc. in AL, FL, ID, MI, MN, OH, OK, VT, & WY; LT Loans in NV, Online Home Loan Center in NH; and Loan Center, Inc. in WA.

©2006 Home Loan Center, Inc. All rights reserved.

---

## Yes! I want to receive a FREE, no obligation Savings Evaluation.


A loan for every home.

**When completed, mail to:**
Attn: S. Gorrell, Loan Expedition
163 Technology Drive, Irvine, CA 92618

**Or, fax this form toll-free:**
(866) 212-2921

| LOAN PURPOSE (Check all that apply) | | | ADDITIONAL CASH NEEDED | $ |
|---|---|---|---|---|
| ☐ Lower My Payment | ☐ Pay Off Credit Cards | ☐ Purchase a New Car | | |
| ☐ Home Improvements | ☐ Pay Off Debt | ☐ Buy a New Home | ☐ Lower My Rate | |

First Name _____ Last Name _____ Home Phone _____ Work Phone _____

Street Address _____ Social Security No. (Optional) _____ $ Annual Salary _____

City _____ State ___ Zip Code ___

What type of property do you own?
☐ Single Family Residence
☐ Condo ☐ Multiple Units
☐ Townhome
☐ Other

Email Address (Your privacy is important to us. Your email will not be distributed to any third parties)

Currently do not own/or own mobile homes.

$ Purchase Price _____ $ What is your home worth? _____ Year Purchased _____

$ 1st Mortgage Balance _____ $ Monthly Payment _____ % Current Interest Rate _____ 2nd Mortgage Balance (if you have one) $ _____ $ Monthly Payment _____ % Current Interest Rate _____

HLC 003637
CONFIDENTIAL

# EXHIBIT G

# EXHIBIT G - GAINES

| CARL GAINES, JOANNE GAINES | HOME LOAN CENTER INC., DBA LENDINGTREE LOANS |
|---|---|
| | 163 TECHNOLOGY DRIVE, IRVINE, CALIFORNIA 92618 |
| | |
| | **Lender's Name and Address** |
| | "We," "us" or "our" means the lender named above. |
| **Address** | No. 2121341 |
| 3521 GRACE AVENUE, BRONX, NEW YORK | Date DECEMBER 19, 2006 |
| 10466 | Credit Limit $ 32,500.00 |
| | Draw Period 120 MONTHS |
| **Borrower's Name and Address** | Repayment Period 120 MONTHS |
| "You" or "your" means each borrower above, jointly and severally. | Maturity Date: DECEMBER 15, 2026 |

## HOME EQUITY LINE OF CREDIT

1. **GENERALLY:** This agreement (the "Agreement") sets out the terms and conditions of your home equity line of credit (the "Line of Credit" or the "Line of Credit Account"). Many of the terms we use in this Agreement have special meanings:
   - The "Line of Credit Account Balance" is the sum of the unpaid principal of loans made under your Line of Credit, plus unpaid but earned finance charges, plus any costs, expenses, and fees that are due.
   - The "Credit Limit" is the maximum amount of principal we ordinarily will allow you to owe us under your Line of Credit at any time.
   - The "Billing Cycle" means the period of time normally covered by monthly periodic statements and includes each period of time even when a statement is not sent because there is no balance on your Line of Credit Account for that period.
   - The "Draw Period" is the period during which you may request advances on your Line of Credit.
   - The "Repayment Period" is the period during which you must repay your Line of Credit Account Balance and may not request further advances.

   If any term of this Agreement violates any law or for some other reason is not enforceable, the term will not be part of this Agreement.

2. **PROMISE TO PAY:** You promise to pay to us, or our order, the total principal of all loans made under your Line of Credit, together with all finance charges, costs, expenses, and fees for which you are responsible under this Agreement. If there is more than one of you, each is jointly and severally liable on this Agreement. This means that we can require any one of you to pay all amounts due under this Agreement, including loans made to any of you, even if in excess of the authorized Credit Limit. Each of you authorizes any other Borrower, on his or her request alone, to cancel the Line of Credit, request and receive advances of principal under your Line of Credit, and to do all actions in connection with the terms of this Agreement. We can release any of you from responsibility under this Agreement, and the others will remain fully responsible hereunder.

3. **TAX DEDUCTIBILITY:** You understand that we (including our employees and representatives) do not make any representations or warranties to you about the tax consequences -- including the deductibility of interest or fees -- of you establishing or using this Line of Credit, and we will not be liable if interest or fees are not deductible. You should consult a tax advisor regarding the deductibility of interest and charges under your Line of Credit.

4. **REQUESTING A LOAN:** During the Draw Period, you may request a loan under your Line of Credit by the following methods:
   - You write a special check that we have given you for this purpose (the "Equity Check").
   - You authorize us to pay a designated third person or account.

   You may not obtain advances under the Line of Credit until any rescission period provided by federal law has expired and we are reasonably satisfied that none of the persons entitled to rescind had rescinded this Agreement and the Line of Credit.

Indymac Bank
HELOC Agreement - I/O Min Pay - New York
8480611 (0803)

Page 1 of 8

VMP Mortgage Solutions, Inc.


(Indymac 2006(NY))
3/06

**CONFIDENTIAL**
**HLC 000386**

When you request a loan, we will advance exactly the amount you request. The smallest amount we will advance to you when you use an Equity Check is $ 250.00 (the "Minimum Advance"). We will make the advance by depositing the amount in your transaction account, by advancing the money directly to you, or by paying a designated third person or account, depending on how we agree to make the advance. We will record the amount as a loan in your Line of Credit Account.

If you request a loan by writing an Equity Check for less than the Minimum Advance, we may, at our option, grant the request. However, granting the request does not mean we will be required to grant requests for less than the Minimum Advance in the future. We always have the option to deny any such request.

We will not ordinarily grant any request for a loan that would cause the unpaid principal balance of your Line of Credit Account to be greater than the Credit Limit listed in this Agreement. We may, at our option, grant such a request without obligating ourselves to do so in the future.

Loans under your Line of Credit may be for any lawful purpose, except that you may not use such loans to pay amounts due on your Line of Credit Account. You will notify us immediately in the event any of your Equity Checks are lost or stolen.

5.    **HOW PERIODIC FINANCE CHARGES ARE COMPUTED:** Finance charges begin to accrue immediately when we make a loan to you. To figure the finance charge for a Billing Cycle, we apply a daily periodic rate of finance charge to the "average daily balance" of your Line of Credit Account for the Billing Cycle. We then multiply that figure by the number of days in the Billing Cycle. The average daily balance is computed as follows. First we take your Line of Credit Account Balance at the beginning of each day and subtract any unpaid finance charges that are due. Next, we subtract the portion of any payments or credits received that day that apply to the repayment of your loans. (A portion of each payment you make is applied to finance charges.) Then we add any new loans made that day. This gives us the daily balance. Then we add up all the daily balances for the Billing Cycle and divide the total by the number of days in the Billing Cycle. This gives us the "average daily balance."

Until the end of the ___1ST___ Billing Cycle after the date of this Agreement (the "Initial Rate Period"), the daily periodic rate of FINANCE CHARGE is ___0.0137___ % which corresponds to an ANNUAL PERCENTAGE RATE of ___4.990___ %. The annual percentage rate corresponding to the periodic rate includes interest and not other costs.

The periodic rate and corresponding annual percentage rate described above are the initial rates assessed under this Line of Credit, and are not based on the formula used for later rate adjustments. Had these rates been based on that formula, the daily periodic rate of FINANCE CHARGE would have been ___0.0214___ %, which corresponds to an ANNUAL PERCENTAGE RATE of ___7.827___ %. At the end of the Initial Rate Period specified above, the rates will be subject to further adjustments and limitations, as described below under the heading Variable Rate.

6.    **VARIABLE RATE:** The "annual percentage rate" referred to in this section is the annual rate that corresponds to the periodic rate applied to the balance as described above. The annual percentage rate may change, and will be THREE AND 000/1000 _____ percentage points ( 3.000% ) above the following "base rate:" the highest base rate on corporate loans posted at large U.S. money center commercial banks as published in the Money Rates table of The Wall Street Journal as the Prime Rate. The annual percentage rate may increase if this "base rate" increases. An increase will take effect on the first day of the Billing Cycle. An increase will result in an increase in the finance charge and it may have the effect of increasing your periodic minimum payment. The annual percentage rate will not increase more often than once a month. A decrease will have the opposite effect of an increase described above.

If the base rate changes more frequently than the annual percentage rate, we will always use the base rate in effect on the day we adjust the annual percentage rate to determine the new annual percentage rate. In such a case, we will ignore any changes in the base rate that occur between annual percentage rate adjustments.

This corresponding ANNUAL PERCENTAGE RATE will never exceed 16%, and will never exceed the highest allowable rate for this type of Agreement as determined by applicable state or federal law.

See the Fee Schedule attached hereto and made a part hereof for additional finance charges and other charges on your Line of Credit.

CONFIDENTIAL
HLC 000387

7.    **MONTHLY PAYMENTS:** We will send you a periodic statement for each Billing Cycle in which there is a balance owing under your Line of Credit, or a credit balance, or a finance charge is imposed. The periodic statement will show, among other things, the amount of the minimum monthly payment (the "Minimum Payment") and the date by which it is due. You must pay us at least the Minimum Payment indicated on the periodic statement by the date indicated on the statement.

During the Draw Period, the Minimum Payment is the amount, if any, by which your outstanding principal loan balance exceeds your Credit Limit, plus the greater of: (a) $100.00; or (b) the amount of accrued but unpaid finance charges, late charges, and any other charges authorized by this Agreement, including, without limitation, any expenses or advances incurred by us under the Security Instrument, as described below under the heading Security. During the Draw Period the minimum payment may not fully repay the principal that is outstanding on your Line of Credit.

During the Repayment Period, the Minimum Payment is the amount, if any, by which your outstanding principal loan balance exceeds your Credit Limit, plus: (a) the amount of accrued but unpaid finance charges, late charges, and any other charges authorized by this Agreement, including, without limitation, any expenses or advances incurred by us under the Security Instrument; and (b) _____0.8333_ % of the principal balance outstanding on the last day of the Draw Period.

If your Minimum Payment includes any other items authorized by this Agreement, we will so advise you, and the periodic statement will include an itemization of such amounts.

You must send all payments to our attention at the address indicated on the periodic statement.

**FINAL PAYMENT:** On the maturity date listed in this Agreement, you must pay the amount of any remaining Line of Credit Account Balance outstanding. The minimum payments may not be sufficient to fully repay the principal that is outstanding on your Line of Credit. If they are not, you will be required to pay the entire outstanding balance in a single balloon payment.

**BALLOON DISCLOSURE: THE TERM OF THIS LOAN IS 20    YEARS. AS A RESULT, YOU WILL BE REQUIRED TO REPAY THE ENTIRE PRINCIPAL BALANCE AND ANY ACCRUED INTEREST THEN OWING 20    YEARS FROM THE DATE ON WHICH THIS LOAN IS MADE.**

WE HAVE NO OBLIGATION TO REFINANCE THIS LOAN AT THE END OF ITS TERM. THEREFORE, YOU MAY BE REQUIRED TO REPAY THE LOAN OUT OF OTHER ASSETS YOU OWN OR YOU MAY HAVE TO FIND ANOTHER LENDER WILLING TO REFINANCE THE LOAN.

ASSUMING WE OR ANOTHER LENDER REFINANCE THIS LOAN AT MATURITY, YOU WILL PROBABLY BE CHARGED INTEREST AT MARKET RATES PREVAILING AT THAT TIME AND SUCH RATES MAY BE HIGHER THAN THE INTEREST RATE ON THIS LOAN. YOU MAY ALSO HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW MORTGAGE LOAN.

8.    **ADDITIONAL REPAYMENT TERMS:** If your Line of Credit Account Balance on a payment date is less than the amount of the Minimum Payment, your minimum monthly payment will equal the Line of Credit Account Balance.

You can pay off all or part of what you owe at any time. However, so long as you owe any amount you must continue to make your periodic Minimum Payment.

The amounts you pay will be applied first to any fees and charges you owe other than principal and finance charges, then to any finance charges that are due, and finally to principal.

9.    **SECURITY:** We have secured your obligations under this plan by taking a security interest (by way of a separate security agreement, mortgage, deed of trust, or other instrument (the "Security Instrument") dated DECEMBER 19, 2006    , in the following property, described by item or type (the "Property"):
3521 GRACE AVENUE, BRONX, NEW YORK 10466

Property securing any other loans that you have with us may also secure this Agreement. You may buy property insurance from anyone you want who is acceptable to us.

CONFIDENTIAL
HLC 000388

10.    CHANGING TERMS OF THIS AGREEMENT:  Generally, we may not change the terms of this Agreement. However, we may change the terms in the following circumstances:

- If this is a variable rate plan, we may change the index and margin if the original index described in this agreement becomes unavailable. Any new index will have a historical movement similar to the original, and, together with a new margin, will produce a similar interest rate.
- We may make changes that you have agreed to in writing.
- We may make changes that unequivocally benefit you.
- We may make changes to insignificant terms of this Agreement.
- If we are required to send notice of a change in terms, we will send the notice to your address listed in this Agreement. (You should inform us of any change in address.)

11.    YOUR RIGHT TO TERMINATE YOUR RIGHT TO OBTAIN LOANS:

A.  **Termination.**  You may terminate your right to obtain loans by sending us a written notice that will become effective upon receipt by us. If more than one person signs this Agreement as Borrower, your right to obtain loans may be terminated by written notice pursuant to this paragraph signed by any one or more of such persons. We may also suspend your right to obtain loans pursuant to paragraph fourteen (14) below. You must notify the servicer at the following address or at a different address as required by servicer of your intent to terminate.

INDYMAC BANK, F.S.B.
P.O. BOX 3038, EVANSVILLE, INDIANA 47730

B.  **Effect of Termination.**  Upon termination of your Line of Credit Account, you must continue to pay the minimum payment due on or before each payment due date until all amounts owed under this Agreement are paid in full. However, you may be required to repay all obligations immediately if we exercise our rights under paragraph thirteen (13) below. You must return unused Equity Checks upon termination. You may be required to pay an account termination fee pursuant to the Fee Schedule attached hereto and made a part hereof.

12.    ATTORNEYS' FEES:  If you default on this Agreement, you agree to pay all of our costs, including reasonable attorneys' fees not in excess of 15% of the unpaid debt, that we incur if this debt is referred for collection to an attorney other than a salaried employee of ours.

13.    TERMINATION OF LINE FOR CERTAIN DEFAULTS:  We may terminate your Line of Credit Account, require you to pay the entire outstanding balance in one payment, and charge you a termination fee (if provided for in this Agreement) and fees related to the collection of the amount owing, if:

(1)  You engage in fraud or material misrepresentation in connection with your Line of Credit;
(2)  You fail to make a payment as required by this Agreement; or
(3)  Your action or inaction adversely affects the collateral or our rights in the collateral.

In that instance, we may take other action short of termination, such as charging you a fee if you fail to maintain required property insurance and we purchase insurance.

Even if we choose not to use one of our remedies when you default, we do not forfeit our right to do so if you default again. If we do not use a remedy when you default, we can still consider your actions as a default in the future.

14.    SUSPENSION OF CREDIT AND REDUCTION OF CREDIT LIMIT:  We may prohibit you from obtaining additional extensions of credit, or reduce your Credit Limit if:

(1)  The value of the dwelling securing this home equity Line of Credit declines significantly below its appraised value for purposes of this Line of Credit;
(2)  We reasonably believe you will not be able to meet the repayment requirements due to a change in your financial circumstances;
(3)  Your payment history on this home equity Line of Credit is not satisfactory;
(4)  You are in default of an obligation of this Agreement or any agreement securing this Agreement, which shall include, but is not limited to, your ongoing obligation to supply us with information we feel we need to assess your financial condition;
(5)  A governmental action prevents us from imposing the annual percentage rate provided for in this Agreement;

CONFIDENTIAL
HLC 000389

(6) The action of a governmental body adversely affects our security interest to the extent that the value of the security interest is less than 120% of the home equity Line of Credit;

(7) The annual percentage rate corresponding to the periodic rate reaches the maximum rate allowed under this Line of Credit (if provided for in this Agreement); or

(8) A regulatory agency has notified us that continued advances would constitute an unsafe and unsound practice.

In the event that we suspend your right to additional advances or reduce your Credit Limit, we will send you notice of our decision at the address listed in this Agreement. (You should inform us of any change in your address.) If we have based our decision to suspend or reduce your credit privileges on an assessment of your financial condition or performance under your Line of Credit, and you believe that your situation has changed, you must request that we re-evaluate your situation, and reinstate your credit privileges.

15.  **WAIVERS AND CONSENT:**  To the extent not prohibited by law and subject to any required notice and opportunity to cure a default for failure to make a required payment, you waive protest, presentment for payment, demand, notice of acceleration, notice of intent to accelerate and notice of dishonor.

To the extent permitted by applicable law, you waive your right to the benefit of exemption as to your Property securing, or to secure, this Agreement. If required by law, we will provide you with separate written statement regarding the waiver of your right of exemption.

16.  **REPRESENTATIONS AND WARRANTIES:**  You represent and warrant to us that the information contained in the loan application, in each material respect, was true at the time the loan application was completed.

You represent and warrant to us that the terms of any existing Security Instrument on the Property permit us to enter into this Agreement and that the loans secured by such existing deed of trust or mortgage are current in all material respects and are not in default.

17.  **LOAN CHARGES:**  If your Line of Credit Account is subject to a law that sets maximum loan charges, and that law is finally interpreted so that the interest or other charges collected, or to be collected, in connection with your Line of Credit Account exceeds the permitted limits, then: (a) any such charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from you that exceeded permitted limits will be refunded to you. We will refund such excess either by reducing the principal owed under your Line of Credit Account or by making a direct payment to you. If we apply the excess toward reducing the principal balance, such reduction shall be treated as a partial prepayment hereunder.

18.  **APPLICABLE LAW:**  Federal law applies to certain aspects of this Agreement, including, but not limited to, the interest rate and related charges. The law of the state where you and the Property are located will apply to the extent legally required. If any term of this Agreement violates any law or for some reason is not enforceable, or becomes unenforceable, that term will not be part of this Agreement.

If the Lender listed on page one of this Agreement is not IndyMac Bank, F.S.B., the following provisions apply to this Agreement: This is to inform you that your loan is an alternative mortgage loan within the definition of the Federal Alternative Mortgage Transactions Parity Act of 1982 (the "Parity Act") (12 U.S.C. §§ 3801 et seq.) and the implementing regulations adopted by the Office of Thrift Supervision ("OTS") (12 C.F.R. §§ 560.220, 560.35 and 560.210). Your loan will be made by us in accordance with the Parity Act requirements of the OTS rather than the provisions of state law. In this regard, pursuant to the authority granted by the Parity Act and the OTS Parity Act regulations, certain state laws will not apply to this loan.

19.  **CREDIT INFORMATION:**  You agree to supply us with whatever information we reasonably feel we need to decide whether to continue this Line of Credit. We agree to make requests for this information without undue frequency, and to give you reasonable time in which to supply the information.

You authorize us to make or have made any credit inquiries we feel are necessary. You also authorize the person or agencies to whom we make these inquiries to supply us with the information we request. Furthermore, you authorize any subsequent consumer reports, other than investigative consumer reports, which may be requested or utilized in connection with an update, renewal, or extension of Line of Credit.

20.  **TITLE INSURANCE AND MORTGAGE RECORDING TAX:**  The cost of title insurance and the mortgage recording tax shall be based on the maximum amount of the Line of Credit available to you, whether advanced or not.

Indymac Bank
HELOC Agreement - I/O Min Pay - New York

8480611 (0803)                                                   Page 5 of 8                                          Indymac 2000(NY)
                                                                                                                      3/06

CONFIDENTIAL
HLC 000390

## ADDITIONAL TERMS

### YOUR BILLING RIGHTS -- KEEP THIS NOTICE FOR FUTURE USE
This notice contains important information about your rights and our
responsibilities under the Fair Credit Billing Act.

*Notify Us In Case of Errors or Questions About Your Bill*

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us at the
address listed on your bill. Write to us as soon as possible. We must hear from you no later than 60 days after we sent you
the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

- Your name and account number.
- The dollar amount of the suspected error.
- Describe the error and explain, if you can, why you believe there is an error. If you need more information,
  describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings, checking, share draft or other account,
you can stop the payment on any amount you think is wrong. To stop the payment your letter must reach us three business
days before the automatic payment is scheduled to occur.

*Your Rights and Our Responsibilities*
*After We Receive Your Written Notice*

We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we
must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can
continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against
your credit limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to
pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned
amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed
payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it
is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation
does not satisfy you and you write to us within ten days telling us that you still refuse to pay, we must tell anyone we report
you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must
tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

Indymac Bank
HELOC Agreement - I/O Min Pay - New York
8490611 (0902)                                        Page 8 of 8

Indymac 2000(NY)
3/06

CONFIDENTIAL
HLC 000391

DEFAULT IN THE PAYMENT OF THIS LOAN AGREEMENT MAY RESULT IN THE LOSS OF THE PROPERTY SECURING THE LOAN. UNDER FEDERAL LAW, YOU MAY HAVE THE RIGHT TO CANCEL THIS AGREEMENT. IF YOU HAVE THIS RIGHT, THE LENDER IS REQUIRED TO PROVIDE YOU WITH A SEPARATE WRITTEN NOTICE SPECIFYING THE CIRCUMSTANCES AND TIMES UNDER WHICH YOU CAN EXERCISE THIS RIGHT.

21.    SIGNATURES: By signing below, you agree to the terms of this Agreement and you promise to pay any amounts you owe under this Agreement. You also state that you received a completed copy of this Agreement on today's date.

| | |
|---|---|
| _Carl Gaines_  12/19/05  (Seal)<br>CARL GAINES              -Borrower | _Joanne Gaines_  12/19/05  (Seal)<br>JOANNE GAINES              -Borrower |
| _____ (Seal)<br>                    -Borrower | _____ (Seal)<br>                    -Borrower |
| _____ (Seal)<br>                    -Borrower | _____ (Seal)<br>                    -Borrower |

CONFIDENTIAL
HLC 000392

## FEE SCHEDULE

You agree to pay the following additional charges in connection with your Line of Credit:

1.  **ADDITIONAL FINANCE CHARGES:** You agree to pay the following additional FINANCE CHARGES:

    | | |
    |---|---|
    | Application Fee | $ _____ |
    | Broker Fee | $ _____ |
    | Closing Agent Fee | $ _____ |
    | Flood Certification Fee | $ _____ |
    | Origination Fee | $ _____ |
    | Points | $ _____ |
    | Tax Service Fee | $ _____ |
    | (Other) _____ | $ _____ |

2.  **OTHER CHARGES:** You agree to pay the following additional charges:

    - Appraisal Fee                      $ _____
    - Check Re-order Fee                 $ _____
    - Credit Report Fee                  $ _____
    - Documentation Fee                  $ _____
    - Recording/Filing Fee               $ _____
    - Title Insurance Fee                $ _____
    - Title Search Fee                   $ _____
    - (Misc.) _____           $ _____
    - An annual charge of $75.00.
    - A late charge on any payment not paid within 15 days of the payment date of 2% of the payment.
    - A charge of $10.00 for each billing cycle where the unpaid principal balance of the Line of Credit is in excess of your Credit Limit.
    - A fee of $20.00 for each check, negotiable order of withdrawal or draft you issue in connection with this loan that is returned because it has been dishonored.
    - A fee of $10.00 to stop payment.

Other charges will be assessed in accordance with the terms of the Line of Credit Agreement.

This Fee Schedule supplements the Line of Credit Agreement and is incorporated therein. Nothing contained in this Fee Schedule shall be deemed to impair in any way your obligations under the Line of Credit Agreement, the related security agreement, mortgage, or deed of trust, or any other document executed by you concerning the indebtedness evidenced by the Line of Credit Agreement.

_____ 10/19/06 (Seal)        _____ 12/19/06 (Seal)
CARL GAINES                        -Borrower      JOANNE GAINES                     -Borrower

_____ (Seal)                  _____ (Seal)
                              -Borrower                                        -Borrower

_____ (Seal)                  _____ (Seal)
                              -Borrower                                        -Borrower

CONFIDENTIAL
HLC 000393

# EXHIBIT G - CAVE

**NOTICE TO BORROWER: THIS LINE OF CREDIT CONTAINS PROVISIONS FOR CHANGES IN THE INTEREST RATE.
A BALLOON PAYMENT MAY BE DUE AT MATURITY.**

| | |
|---|---|
| Johnnie M. Cave<br>5042 Pennbrook Drive<br>Chesterfield, Virginia 23832 | Home Loan Center, Inc., dba LendingTree Loans<br>163 Technology Drive<br>Irvine, CA 92618 |
| **Borrower's Name and Address**<br>"You" means each borrower above, jointly and severally. | **Lender's Name and Address**<br>"We" or "us" means the lender named above. |

| | | | |
|---|---|---|---|
| No. 2119107 | Initial Advance $ 22,400.00 | Billing Cycle: Ends monthly | |
| Date 10/12/2006 | Minimum Advance $ 100.00 | Payment Date: monthly | |
| Line of Credit $ 22,400.00 | Minimum Balance $ 0 | | |
| MIN: 100196800021191072 | Draw Period 15 years | | |

## HOME EQUITY LINE OF CREDIT AGREEMENT AND PROMISSORY NOTE (the "Agreement")

**GENERALLY:** This is an agreement about your home equity line of credit. Many of the terms we use in this agreement have special meanings. The term "loan account balance" means the sum of the unpaid principal of loans made under this plan, plus unpaid but earned finance charges, any fees, plus any credit insurance premiums that are due. "Line of Credit" means the maximum amount of principal we will ordinarily allow you to owe to under this plan at any time.

In addition, we will use the following terms for this home equity plan: "Initial Advance" means the amount of money we will require you to accept as an advance to open the plan. "Minimum Advance" means the smallest amount of money we will advance to you at your request. The "Minimum Balance" is the amount of principal of loans we will require you to maintain outstanding during the plan. If the principal balance outstanding falls below the minimum balance, you may have to pay a fee as described below.

The "Draw Period" is the time during the plan that you may request advances and will make payments on your loan account balance.

If any term of this agreement violates any law or for some other reason is not enforceable, that term will not be part of this agreement. This agreement is subject to the laws of the state where we are located.

**COMMISSIONS:** You understand and agree that we (or our affiliate) will earn commissions or fees on any insurance products, and may earn such fees on other services, that you buy through us or our affiliate.

**TAX DEDUCTIBILITY:** You should consult a tax advisor regarding the deductibility of interest and charges under this home equity plan.

**REQUESTING A LOAN:** You request a loan under this plan whenever you:
1. write a check for at least the minimum advance listed above using one of the special checks you have for that purpose.
2. authorize a payment to a third person or account and indicate to us in the manner we require that the payment be made with funds we advance you.
3. use the credit card(s) you have requested to make purchases or receive cash loan advances.

**HOW THE LOAN IS ADVANCED:** When you request a loan, we will, subject to any limitations contained in this agreement, advance exactly the amount you request, so long as the requested amount equals or exceeds the minimum advance listed above. We will make the advance by advancing the money directly to you or by paying a designated third person or account, depending on how we agree to make the advance. We will record the amount as a loan in your loan account.

If your request is for less than the minimum advance, we may, at our option, grant the request. However, granting the request does not mean we will be required to grant requests for less than the minimum advance in the future. We always have the option to deny any such request.

However, we will not ordinarily grant any request for a loan which would cause the unpaid principal of your loan account balance to be greater than the Line of Credit listed above. We may, at our option, grant such a request without obligating ourselves to do so in the future.

Any amount granted over the credit limit shall be considered unsecured and will not affect the terms of the agreement.

**HOW FINANCE CHARGES ARE COMPUTED:** Finance charges begin to accrue immediately when we make a loan to you. To figure the finance charge for a billing cycle, we apply a daily periodic rate of finance charge to the "principal balance" of your loan account each day.

To figure the "principal balance" for each day, we first take your loan account balance at the beginning of the day and subtract any unpaid finance charges, any fees, and credit insurance premiums (if any) that are due. Next, we subtract the portion of any payments or credits received that day which apply to the repayment of your loans. Then we add any new loans made that day. The final figure is the "principal balance."

K    The daily periodic rate of FINANCE CHARGE is 0.0198 % which corresponds to an ANNUAL PERCENTAGE RATE of 7.2500 %. The initial interest rate will be in effect until    Jan 12, 2007.

I    Until    N/A    , the periodic rate and corresponding annual percentage rate will be determined by discounting the "base rate" described below under the heading Variable Rate and Margin by    N/A    percentage points. Based on this relationship, the daily periodic rate of FINANCE CHARGE is    N/A    % which corresponds to an ANNUAL PERCENTAGE RATE of    N/A    %.

The periodic rate and corresponding annual percentage rate described above are the initial rates assessed under this plan, and are not based on the relationship used for later rate adjustments. Had these rates been based on that relationship, the daily periodic rate of FINANCE CHARGE would have been    0.0352    % which corresponds to an ANNUAL PERCENTAGE RATE of 12.8750 %. The annual percentage rate includes interest and no other costs.

On    Jan 13, 2007    , the rates will be subject to further adjustments and limitations, and produce the effects described below under the heading Variable Rate and Margin.

I    The daily periodic rate of FINANCE CHARGE is    N/A    % which corresponds to an ANNUAL PERCENTAGE RATE of    0.0000    %. The annual percentage rate includes interest and no other costs.

**VARIABLE RATE AND MARGIN:** The annual percentage rate may change, and will be    4.8250    percentage point(s) above the following "base rate": the highest base rate on corporate loans at large U.S. money center commercial banks that The Wall Street Journal publishes as the prime rate. The annual percentage rate may increase if this "base rate" increases. An increase will take effect on the first day of the billing cycle. An increase will result in an increase in the finance charge and it may have the effect of increasing your periodic minimum payment. The annual percentage rate will not increase more often than once a month. A decrease will have the opposite effect of an increase disclosed above.

If the base rate changes more frequently than the annual percentage rate, we will always use the base rate in effect on the day we adjust the annual percentage rate to determine the new annual percentage rate. In such a case, we will ignore any changes in the base rate that occur between annual percentage rate adjustments.

The "annual percentage rate" referred to in this section is the annual rate which corresponds to the periodic rate applied to the balance as described above. This corresponding ANNUAL PERCENTAGE RATE will never exceed 24%, and will never exceed the highest allowable rate for this type of agreement as determined by applicable state or federal law.

**HOW YOU REPAY YOUR LOANS:** On or before each payment date, you promise to pay your minimum payment. The minimum payment amount is the accrued finance charges on the last day of the billing cycle and other fees charged to the account.

**PRINCIPAL REDUCTION:** During the draw period the minimum payment will not reduce the principal that is outstanding on your line.

**FINAL PAYMENT:** At the end of the Draw Period (the maturity date), you promise to pay the amount of any remaining loan account balance outstanding. The minimum payment will not fully repay the principal that is outstanding on your line. At that time you will be required to pay the entire balance in a single balloon payment.

If you have any loan account balance at that time, we are not obligated to refinance your loan account, but will consider your request to do so. If you refinance this account at maturity, you may have to pay some or all of the closing costs normally associated with a new loan even if you obtain financing from us.

**ADDITIONAL REPAYMENT TERMS:** If you fail to make a payment, we may, but are not required to, advance money to you to make the payment. All the terms of this agreement would apply to such a loan.

You can pay off all or part of what you owe at any time. However, so long as you owe any amount you must continue to make your periodic minimum payment.

The amounts you pay will be applied first to any charges you owe other than principal and finance charges, then to any finance charges that are due, and finally to principal.

Your first payment will be due on the first payment date after you receive your first statement. All other payments are due on the payment dates described above.

**SECURITY:** To secure the payment of what you owe, we have the right of set-off. This means we can pay the amount you owe us out of money that we are required to pay you, (such as money in your savings or checking account). However, we cannot set-off any money in your IRA or other tax-deferred retirement account. State law may further limit our right of set-off.

However, we will have no right of set-off if you can obtain credit under this plan by using a debit or a credit card.

We have also secured your obligations under this plan by taking a security interest (by way of a separate security agreement, mortgage or other instrument dated    October 12, 2006    ) in the following property, described by item or type:

5042 Pennbrook Drive
Chesterfield, Virginia 23832

Property securing any other loans that you have with us may also secure this agreement.

You agree to obtain and maintain adequate insurance against fire, flood and such other reasonable risks to the aforementioned real estate as we may require, with loss payable clause in our favor as our interest may appear. Any proceeds of insurance required to be obtained hereunder will also be security for all sums due on the Account.

You may obtain such insurance from any agent, broker or insurance company of your choice, which is licensed to do business in the state where the real estate is located, but we reserve the right to reject any insurance company or policy for reasonable cause.

If you fail to keep the real estate insured as aforesaid, we may at our option purchase and pay for such insurance, and the amount paid by us shall be added as an advance hereunder, to the balance due and be subject to finance charges.

**WAIVER OF EXEMPTION:** You waive the benefit of all homestead and other exemptions as they relate to any interest in the property given as security for this debt.

Borrower's Initials:

*(page 1 of 2)*

ExperT© 1983 Bankers Systems, Inc., St. Cloud, MN Form RFCOCPHE2VA 10/28/2004 11144L1

CONFIDENTIAL
HLC 000028

## ADDITIONAL TERMS

**DEFAULT:** You will be in default on this agreement if any of the following occur:

(1) You engage in fraud or material misrepresentation, by your actions or failure to act, in connection with any phase of this home equity line of credit;

(2) Subject to any right to cure you may have, you do not meet the repayment terms;

(3) Your action or inaction adversely affects the collateral or our rights in the collateral, including but not limited to: (a) failure to maintain required insurance on the dwelling; (b) your transfer of the property; (c) failure to maintain the property or use of it in a destructive manner; (d) commission of waste; (e) failure to pay taxes on the property or otherwise fail to act and thereby cause a lien to be filed against the property that is senior to our lien; (f) death, (g) the property is taken through eminent domain, (h) a judgment is filed against you and subjects you and the property to action that adversely affects our interest; or (i) a prior lien holder forecloses on the property and as a result, our interest is adversely affected.

**REMEDIES:** We may terminate your account, require you to pay the entire outstanding balance in one payment and charge you a termination fee (if provided for in this agreement), and fees related to the collection of the amount owing, if you are in default in any manner described above. In that instance, we may take other action short of termination, such as charging you a fee if you fail to maintain required property insurance and we purchase insurance. If we elect to terminate and accelerate the amounts owing on your account, we may use our right to set-off, unless prohibited.

Even if we choose not to use one of our remedies when you default, we do not forfeit our right to do so if you default again. If we do not use a remedy when you default, we can still consider your actions as a default in the future.

**SUSPENSION OF CREDIT AND REDUCTION OF CREDIT LIMIT:** We may temporarily prohibit you from obtaining additional extensions of credit, or reduce your credit limit if:

(1) The value of the dwelling securing this home equity line of credit declines significantly below its appraised value for purposes of this line;

(2) We reasonably believe you will not be able to meet the repayment requirements due to a material change in your financial circumstances;

(3) You are in default of a material obligation of this agreement, which shall include, but is not limited to, your ongoing obligation to supply us with information we feel we need to assess your financial condition;

(4) A governmental action prevents us from imposing the annual percentage rate provided for in this agreement;

(5) The action of a governmental body adversely affects our security interest to the extent that the value of the security interest is less than 120% of the home equity line;

(6) The annual percentage rate corresponding to the periodic rate reaches the maximum rate allowed under this plan (if provided for in this agreement); or

(7) A regulatory agency has notified us that continued advances would constitute an unsafe business practice.

In the event that we suspend your right to additional advances or reduce your credit line, we will send you notice of our decision at the address listed on page 1 of this agreement. (You should inform us of any change in your address.) If we have based our decision to suspend or reduce your credit privileges on an assessment of your financial condition or performance under this plan, and you believe that your situation has changed, you must request that we re-evaluate your situation, and reinstate your credit privileges.

**CREDIT INFORMATION:** You agree to supply us with whatever information we reasonably feel we need to decide whether to continue this plan. We agree to make requests for this information without undue frequency, and to give you reasonable time in which to supply the information.

You authorize us to make or have made any credit inquiries we feel are necessary. You also authorize the persons or agencies to whom we make these inquiries to supply us with the information we request.

**ASSIGNMENT:** We may assign all or part of the Account balance and our rights under this agreement and the mortgage, deed of trust or other security agreement securing the Account to any person or entity without notice to you. You may not transfer your rights under this agreement or the Account balance.

### YOUR BILLING RIGHTS
### KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

*Notify Us In Case of Errors or Questions About Your Bill*

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In your letter, give us the following information:

Your name and account number.
The dollar amount of the suspected error.
Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings, checking or other account, you can stop the payment on any amount you think is wrong. To stop the payment your letter must reach us three business days before the automatic payment is scheduled to occur.

*Your Rights and Our Responsibilities*
*After We Receive Your Written Notice*

We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If you didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, you may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We

---

must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

### Special Rule for Credit Card Purchases

If you have a problem with the quality of property or services that you purchased with a credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or services. There are two limitations on this right:

(a) You must have made the purchase in your home state or, if not within your home state within 100 miles of your current mailing address; and

(b) The purchase price must have been more than $50.

These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or services.

### LIABILITY FOR UNAUTHORIZED USE OF A CREDIT CARD

You may be liable for the unauthorized use of your credit card. You will not be liable for unauthorized use that occurs after you notify us at the address on page 1 of this form, orally or in writing, of the loss, theft, or possible unauthorized use. In any case, your liability will not exceed $50.

**CHANGING THE TERMS OF THIS AGREEMENT:** Generally, we may not change the terms of this agreement. However, we may change the terms in the following circumstances:

If this is a variable rate plan, we may change the index and margin if the original index described on page 1 becomes unavailable. Any new index will have a historical movement similar to the original, and, together with a new margin, will produce a similar interest rate.

We may make changes that you have agreed to in writing.

We may make changes that unequivocally benefit you.

We may make changes to insignificant terms of this agreement.

We will refuse to make additional extensions of credit or reduce your credit limit if the maximum annual percentage rate is reached.

If we are required to send notice of a change in terms, we will send the notice to your address listed on page 1. (You should inform us of any change in address.)

**ADDITIONAL CHARGES:** You agree to pay the following additional charges:

A late charge on any payment not paid within 15 days of the payment date of 5% of the payment.

Additional **FINANCE CHARGES** See Attached Fee Addendum

| | | | | |
|---|---|---|---|---|
| Broker Fees | $ XX | ; Points | $ XX | ; |
| Origination Fees | $ XX | ; Courier Fees | $ XX | ; |
| (Other) | | | $ XX | ; |

Other Loan Fees See Attached Fee Addendum

| | | | | |
|---|---|---|---|---|
| Application Fee | $ XX | ; Official Fees | $ XX | ; |
| Appraisal | $ XX | ; Title Search | $ XX | ; |
| Property Survey | $ XX | ; Title Insurance | $ XX | ; |
| Credit Report Fees | $ XX | ; Taxes | $ XX | ; |
| Documentation Fees | $ XX | ; Mort. Reg. Tax | $ XX | ; |
| Filing Fees | $ XX | ; | | |
| Returned Check Charge | $ 0.00 | | | |
| Stop Payment Charge | $ 0.00 | | | |
| (Other) | | | $ XX | ; |

**ATTORNEY'S FEES:** You agree to pay all our costs, including reasonable attorney's fees that we incur in legal proceedings to collect or enforce this debt should you be in default.

**NOTICE TO JOINT APPLICANTS:** You may close the account at any time by notifying us in writing. Cancellation of the account shall cancel the account for all persons on the account.

**SIGNATURES:** By signing below, you agree to the terms of this agreement and you promise to pay any amounts you owe under this agreement. You also state that you received a completed copy of the agreement on today's date.

Signature _Johnnie M. Cave_ (SEAL)
Johnnie M. Cave

Signature _____ (SEAL)

Signature _____ (SEAL)

Signature _____ (SEAL)

Signature _____ (SEAL)

Signature _____ (SEAL)

By: _Virginie Torres_

This is to certify that this is the Note described in and secured by a Deed of Trust dated **October 12, 2006** on the property located at **5042 Pennbrook Drive, Chesterfield** , Virginia.

My commission expires: _1/31/2010_

Notary Public

CONFIDENTIAL
HLC 000029

ExPerf̲e̲®, 1983 Bankers Systems, Inc., St. Cloud, MN Form RECOCPHEIZVA 10/28/2004 11144L2    (page 2 of 2)